UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------X
STEVEN SHAW,

                Plaintiff,                               Docket No.: 20-cv-410

    -against-                                    **ANSWER**

THE HONORABLE THOMAS B. MODLY,        **JURY TRIAL DEMANDED**
ADMIRAL CHRISTOPHER GRADY,
VICE ADMIRAL DEWOLFE MILLER,
REAR ADMIRAL ROY KELLEY, and
TIMOTHY C. PARLATORE, ESQ.

                Defendants.
------------------------------------------------------------------------X

Defendant, TIMOTHY C. PARLATORE, ESQ., *pro se*, as his answer to the complaint herein, state as follows:

1.  Admits the allegations contained in paragraphs 1.

2.  Admits that Defendant Mr. Modly is the Acting Secretary of the Navy but denies the remainder of the allegations contained in paragraph 2.

3.  Admits the allegations contained in paragraph 3.

4.  Admits that Defendant Vice Admiral Miller is the Commander of Naval Air Forces but denies the remainder of the allegations contained in Paragraph 4.

5.  Admits that Defendant Rear Admiral Kelley is the Commander of Naval Air Forces Atlantic and that he properly convened a Field Naval Aviator Evaluation Board (FNAEB) against LT Shaw, which properly found that LT Shaw should be removed from flight status, but denies the remainder of the allegations contained in paragraph 5.

6.  Admits that I do represent CDR Martin Weyenberg, CDR Bryan Roberts, and LtCol Nesbitt, but denies the remainder of the allegations contained in paragraph 6.   Additionally, Defendant states affirmatively that, relevant to this action, he also represents CDR Brandon Scott.

7.   Denies the allegations contained in paragraph 7 and notes that, as a private individual, the Privacy Act 5 U.S.C. §552a does not apply to Defendant Parlatore.

8.   Denies the jurisdictional claims contained in Paragraph 8.

9.   Denies the jurisdictional claims contained in paragraph 9 and states affirmatively that this was a misjoinder of claims.

10. Denies the allegations contained in paragraph 10 and states affirmatively that the Pentagon is physically located in the Northern District of Virginia.

11. Denies the allegations contained in paragraph 11.

12. Denies the allegations contained in paragraph 12 and states affirmatively that every administrative action taken against LT Shaw was due to his own misconduct, not any improper retaliatory purpose.

13. Denies the allegations contained in paragraph 13 and states affirmatively that Gregory Slavonic, Assistant Secretary of the Navy for Manpower and Reserve Affairs (ASN M&RA) issued a wrongful order rescinding the entirely appropriate actions taken against LT Shaw based on a deeply flawed DoD IG report and political pressure orchestrated by LT Shaw.

14. Admits the allegations contained in paragraph 14.

15. Denies the allegations contained in paragraph 15 and states affirmatively that LT Shaw actively sought out former African American SPs, at least one of which had already disenrolled before LT Shaw arrived at the squadron, to coax them into filing EO complaints with the promise that he could help them get back into the program.  However, both of these former SPs were disenrolled due to poor performance, not racial discrimination.  At least one of these former SPs has since admitted that he was not progressing at the same rate as his peers and did not believe that he was the victim of bias.

16. Denies the allegations contained in paragraph 16 and states affirmatively that the evidence demonstrated that the LSOs never manipulated the grades, other than to "plus up" a grade if the student was showing improving trends.

17. Denies the allegations contained in paragraph 17, except to admit that LT Shaw did file a complaint without making any effort to address the issue with his chain of command.

18. Denies the allegations contained in paragraph 18 and states affirmatively that the claim that LtCol Nesbitt "publicly announced that there would be negative consequences for anyone who seeks redress through IG channels" is a recent fabrication that was not a claim that LT Shaw made to the DoD IG at the time.

19. Denies the allegations contained in paragraph 19.

20. Denies the allegations contained in paragraph 20.

21. Denies the allegations contained in paragraph 21.

22. Denies the allegations contained in paragraph 22.

23. Denies the allegations contained in paragraph 23, except to admit that an article was published, facilitated by LT Shaw's efforts to pursue a public relations campaign against his squadron, in which LT Shaw admits to committing misconduct.

24. Denies the allegations contained in paragraph 24, especially insofar as it implies that CDR Weyenberg authorized LT Shaw to teach dangerous and unapproved techniques.  As LT Shaw was never an LSO, he was not even eligible to become an instructor at CQ techniques.

25. Denies the allegations contained in paragraph 25.

26. Denies the allegations contained in paragraph 26 and states affirmatively that this information had been routinely disseminated to the instructor pilots.  All instructors, including LT Shaw, were fully aware that they were required to only teach within the approved syllabus and that

any individual who believes that the syllabus could be improved must submit a change request. This meeting, which was ordered by Commodore, CSFWL, was not timed "to publicly debase LT[1] Shaw," but rather to remind all instructors of the how to properly submit a change a request for any and all syllabus changes after LT Shaw admitted to military.com that he was violating those procedures.

27. Denies the allegations contained in paragraph 27, except to admit that the very next day, April 12, 2018, LT Shaw did submit four change requests.  However, rather than following the direction to submit these change requests directly to the Training Model Manager (TMM) LT Shaw inexplicably decided to submit these four change requests to his entire chain of command, copying all VFA-106 IPs.  His choice to disregard the TMM's instruction and send the change requests to all of the instructor cadre, circumvented the already in-place protections and anonymity for individuals to recommend changes, thus undermining his claimed fear that submitting change requests would lead to ostracism.  Furthermore, when the VFA106 TMM (Training Model Manager) reached out to LT Shaw concerning his suggestions asking for amplifying data and examples to help with the change process, LT Shaw failed to respond in any manner.  Finally, none of these change requests dealt with the unauthorized techniques that LT Shaw was secretly teaching to students.

28. Denies the allegations contained in paragraph 28, and states affirmatively that the aircraft data showed that the student in question made an absurdly long power-off correction of nearly 5 seconds at almost idle power, resulting in a power deficit that was unrecoverable.  Analysis of the aircraft data and video showed that the only reason it was not a violent explosive impact on the back of the ship was that the LSO's recognized the low power setting of the aircraft and initiated

---

[1] Throughout the complaint, Plaintiff uses incorrect abbreviations for Naval Officer ranks.  All quoted portions in this answer have been modified to reflect the correct rank abbreviations.

a Waveoff.  Had a Waveoff not been issued, it likely would have resulted in a catastrophic ramp strike.  The initial aircraft data brought to the LSO's by VFA-106 maintenance was incorrect in that it showed seemingly no response to LSO calls for power.  When the appropriate data was given, it showed that while the student did in fact go to full power when called for by the LSO's, it took exceedingly long for the motors to spool up from an underpowered state, resulting in an adverse landing.  Regardless, the result was a Disqualification due to pilot technique, however it was determined that the error was a trainable issue.  He was never " told he would be given a free pass if he implicated LT Shaw in any wrongdoing."  Given that the command had recently learned that LT Shaw was teaching a dangerous and unapproved technique for landing on an aircraft carrier, the board wanted to give the student every benefit of the doubt and did not want to penalize him if his landing was the result of an instructor's intentional misconduct.  Failure to ask this question would have demonstrated reckless disregard for both a potential safety issue as well as an innocent explanation for the student's landing.

29. Denies the allegations contained in paragraph 29.

30. Denies the allegations contained in paragraph 30.

31. Denies the allegations contained in paragraph 31.

32. Denies the allegations contained in paragraph 32, except to admit that an initial draft of the appointing order, which was written by someone who had not consulted with the judge advocate, did include a larger scope than was ultimately ordered.

33. Denies the allegations contained in paragraph 33 except to admit that the final scope was narrower than the original draft and that CDR Roberts was assigned to investigate.

34. Admits the allegations contained in paragraph 34.

35.  Denies the allegations contained in paragraph 35.

36. Denies the allegations contained in paragraph 36 and states affirmatively that CDR Roberts was suggesting that, given the mountain of unrebutted incriminating evidence, the command could proceed with a FNAEB. CDR Roberts made this recommendation because he felt that the majority of LT Shaw's actions created more of a Safety than a legal problem and a FNAEB is an administrative board that provides LT Shaw a more fair process overall with no legal implications

37. Denies the allegations contained in paragraph 37, except to admit that LT Keedy did inform CDR Roberts that LT Shaw had sent him a video that had been taken inside a restricted area. CDR Roberts did inform NCIS, but the issue was not solely whether the video captured classified information, but the fact that LT Shaw knowingly and intentionally violated regulations to wrongfully bring a video camera into a secured facility. Additionally, CDR Scott suspended LT Shaw's access to classified materials after he asked him directly whether he had taken a camera into a secured facility and LT Shaw refused to answer.

38. Denies the allegations contained in paragraph 38.

39. Denies the allegations contained in paragraph 39.

40. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 40, as LT Shaw's assigned duties after he was detached for cause is outside of the purview of my clients.

41. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 41.

42. Admits the allegations contained in paragraph 42, except to clarify that CDR Scott's decision was based on the evidence against LT Shaw, not the recommendation by CDR Roberts.

43. Denies the allegations contained in paragraph 43, except to admit that LT Shaw refused NJP and that the command decided not to pursue court martial charges.

44. Denies the allegations contained in paragraph 44, except to admit that a FNAEB was convened for LT Shaw.

45. Denies the allegations contained in paragraph 45.

46. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 46.

47. Admits the allegations contained in paragraph 47.

48. Admits the allegations contained in paragraph 48.

49. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 49, except to deny the legal conclusions drawn.

50. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 50.

51. Admits the allegations contained in paragraph 51, except to deny the comparison of the FNAEB result to "all FNAEBs ever held in the Navy."

52. Denies the allegations contained in paragraph 52.

53. Admits the allegations contained in paragraph 53.

54. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 54.

55. Admits the allegations contained in paragraph 55, except to clarify that misconduct need not result in NJP or Court Martial conviction to warrant inclusion on a FITREP.

56. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 56.

57. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 57.

58. Admits the allegations contained in paragraph 58 but disputes the validity of the DoD IG findings based on misconduct by the DoD IG investigator, which is currently the subject of an IG complaint.

59. Admits the allegations contained in paragraph 59 and adds that the deeply flawed DoD IG report was thoroughly rejected by the Marine Corps chain-of-command before issuing a Report of No Misconduct, clearing LtCol Nesbitt of the false claims against him.

60. Denies the allegations contained in paragraph 60, and states affirmatively that CDR Scott ordered a Command Safety Assessment (CSA), which is only applicable to squadron aircrew (in VFA-106, this means instructor pilots). A separate Maintenance Climate Assessment Survey (CMAS) for all the ground crew was initiated around the same time.  As an aviator, Plaintiff is fully aware of the Naval Aviation Climate Assessment Survey System (ACASS) and knows the allegations made in this paragraph are false.

61. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 61, except to note that LT Shaw's wrongful weaponization of the IG system (and now the federal court system) to avoid responsibility for his own misconduct does present a delicate challenge to Navy leadership.  A proper balance must be achieved where whistleblowers are protected, while abusers of the system are held accountable.

62. Admits the allegations contained in paragraph 62 and states affirmatively that we believe that Mr. Slavonic's decision wrongfully relied upon the deeply flawed DoD IG report which the Marine Corps had already rejected.   Additionally, the recommendation to DoD CAF misrepresented the basis of the suspension and revocation, as it was not based on the CDI, but rather LT Shaw's conduct.  Moreover, when listing Mr. Slavonic's orders, Plaintiff inexplicably failed to include the full list, specifically that:

If a Command Investigation (CI) is ordered in accordance with reference (c), it may only be ordered by USFFC, and investigated by an officer who is assigned to USFFC and who does not have the designator of 1310 or 1320. Any witness who provides a statement must be informed that any previous statements made by them for the purposes of the CDI will not be used in the CI. USFFC may use the CI for any lawful follow – on personnel actions. However, if a CI is ordered, it may only inquire into the following areas:

(1) Whether LT Shaw, without authorization, recorded F/A-18 TOFT training sessions; and

(2) Whether LT Shaw was conducting unauthorized training (such as Velocity Vector) or was otherwise training outside of phase.

63. Denies information sufficient to form a belief as to the veracity of the allegations contained in paragraph 63.

64. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 61, except to note that the scope of ADM Grady's CDI alleged is word-for-word the same scope as directed by Mr. Slavonic.

65. Denies the allegations contained in paragraph 65.

66. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 66.

67. Denies the allegations contained in paragraph 67, except to admit that I did file a complaint with the DoD IG to investigate the wrongdoing by David Ursini.

68. Admits the allegation contained in paragraph 68 that this complaint included a copy of the CSA and declines to answer the allegations regarding the source of this document, as it is covered by privilege, work product, and confidentiality.

69. Admits that a copy of this complaint was provided to the Project on Government Oversight (POGO), as they had received materials from LT Shaw and advocated on his behalf with Mr. Slavonic's office.

70. Denies the allegations contained in paragraph 70, except to admit that I have made several protected communications on behalf of my clients to their elected representatives. Lacks information sufficient to form a belief as to the veracity of the claim that this has been distributed "throughout the Naval Aviation community" and states affirmatively that the allegations that I claimed that LT Shaw committed theft of intellectual property is completely invented and frivolous by Platintiff.

71. Lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 71, except to note that any reputational harm suffered by LT Shaw was the result of his own conduct.

72. Paragraph 72 contains an explanation of law that requires no admission or denial.

73. Denies the allegations contained in paragraph 73 and states affirmatively that the flawed findings of a single DoD IG investigator are not binding and should be investigated and reversed.

74. Denies the allegations contained in paragraph 74 and states affirmatively that the order came from Mr. Slavonic, not Mr. Modly.  Moreover, this order cannot be considered final agency action, as Mr. Slavonic explicitly permitted a second investigation and appointed ADM Grady to be the convening authority over this investigation.

75. Denies the allegations contained in paragraph 75 and states that the initiation of a second CDI cannot be reasonably considered to be "in direct contradiction" to Mr. Slavonic's letter when the letter specifically authorized the second investigation.

76. Denies the allegations contained in paragraph 76.

77. Paragraph 77 contains an explanation of law that requires no admission or denial.

78. Paragraph 78 contains an explanation of law that requires no admission or denial.

79. Paragraph 79 contains an explanation of law that requires no admission or denial.

80. Denies the allegations contained in paragraph 80 and states affirmatively that the flawed findings of a single DoD IG investigator are not binding and should be investigated and reversed.

81. Denies the allegations contained in paragraph 81 and states affirmatively that the order came from Mr. Slavonic, not Mr. Modly.  Moreover, this order cannot be considered final agency action, as Mr. Slavonic explicitly permitted a second investigation and appointed ADM Grady to be the convening authority over this investigation.

82. Denies the allegations contained in paragraph 82.

83. Denies the allegations contained in paragraph 83.

84. Paragraph 84 contains an explanation of law that requires no admission or denial.

85. Paragraph 85 contains an explanation of law that requires no admission or denial.

86. Paragraph 86 contains an explanation of law that requires no admission or denial.

87. Denies the allegations contained in paragraph 87 and states affirmatively that the flawed findings of a single DoD IG investigator are not binding and should be investigated and reversed.

88. Denies the allegations contained in paragraph 88 and states affirmatively that the order came from Mr. Slavonic, not Mr. Modly.

89. Denies the allegations contained in paragraph 89.

90. Denies the allegations contained in paragraph 90.

91. Paragraph 91 contains an explanation of law that requires no admission or denial.

92. Paragraph 92 contains an explanation of law that requires no admission or denial.

93. Paragraph 93 contains an explanation of law that requires no admission or denial.

94. Denies the allegations contained in paragraph 94.

95. Denies the allegations contained in paragraph 95.

96. Denies the allegations contained in paragraph 96.

97. Denies the allegations contained in paragraph 97.

98. Paragraph 98 contains an explanation of law that requires no admission or denial.

99. Paragraph 99 contains an explanation of law that requires no admission or denial.

100.    Denies the allegations contained in paragraph 100.

101.    Paragraph 101 contains an explanation of law that requires no admission or denial.

102.    Denies the allegations contained in paragraph 102.

103.    Denies the allegations contained in paragraph 103.

104.    Paragraph 104 contains an explanation of law that requires no admission or denial.

105.    Paragraph 105 related to a cause of action that has already been dismissed and requires no answer.

106.    Paragraph 106 related to a cause of action that has already been dismissed and requires no answer.

107.    Paragraph 107 related to a cause of action that has already been dismissed and requires no answer.

108.    Paragraph 108 related to a cause of action that has already been dismissed and requires no answer.

109.    Paragraph 109 related to a cause of action that has already been dismissed and requires no answer.

110.    Paragraph 110 contains an explanation of law that requires no admission or denial.

111.    Denies the allegations contained in paragraph 111.

112.    Denies the allegations contained in paragraph 112.

113.    Denies the allegations contained in paragraph 113.

114.    Denies the allegations contained in paragraph 114.

## DEFENSES

In further answer to the Complaint, and as and for separate, affirmative defenses, without assuming the burden to prove that which properly falls upon Plaintiff, Defendant avers:

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The Plaintiff's libel claims are barred as he is a libel-proof Plaintiff.

### Third Affirmative Defense

The Plaintiff is a limited purpose public figure.

### Fourth Affirmative Defense

Plaintiff's libel claims fail because the statements are true.

### Fifth Affirmative Defense

The Plaintiff has improperly joined these claims and therefore this Court lacks jurisdiction.

### Sixth Affirmative Defense

This matter should not proceed for plaintiff's failure to join all necessary parties.

### Seventh Affirmative Defense

The Complaint is barred by the doctrine of unclean hands.

### Eighth Affirmative Defense

Upon information and belief, if plaintiff suffered or sustained any loss, damage or injury as alleged in the Complaint such damages were the direct and proximate result of his own conduct.

### JURY DEMAND

Pursuant to Fed.R.Civ.P. 38, Defendant demands a jury trial on all issues triable of right by a jury.

WHEREFORE, Defendant Timothy Parlatore respectfully requests that this Court dismiss the

complaint, together with such other and further relief as the Court deems appropriate.

Dated: February 27, 2020
       Falls Church, Virginia

Respectfully submitted,

Timothy C. Parlatore, Esq.
*Defendant, Pro Se*
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com