UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------X
STEVEN SHAW,

              Plaintiff,                          Docket No.: 20-cv-410

      -against-

THE HONORABLE THOMAS B. MODLY,
ADMIRAL CHRISTOPHER GRADY,
VICE ADMIRAL DEWOLFE MILLER,
REAR ADMIRAL ROY KELLEY, and
TIMOTHY C. PARLATORE, ESQ.

               Defendants.
-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A STAY OF PROCEEDINGS

Timothy C. Parlatore, Esq.
*Defendant, Pro Se*
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com

## TABLE OF CONTENTS

LIST OF ACRONYMS .................................................................................................3

PRELIMINARY STATEMENT ....................................................................................4

STATEMENT OF FACTS ............................................................................................5

  Background ...............................................................................................................5

  The Complaints .........................................................................................................7

  LT Shaw's Dangerous Misconduct ..........................................................................9

  Accountability vs. Retaliation ..................................................................................9

  Agency Action .........................................................................................................10

  LT Shaw Files a Frivolous Lawsuit ........................................................................11

  Plaintiff's False Jurisdictional Claims Unravel, Leading to This Motion .............12

LEGAL STANDARD ...................................................................................................13

ARGUMENT ................................................................................................................15

  I.    A Stay is Inappropriate Because the Proffered Administrative Remedy that Plaintiff
  Failed to Pursue is Inapplicable ...............................................................................15

  II.   A Stay is Being Sought for an Improper Purpose, Based on a Misrepresentation of
  the Facts .....................................................................................................................16

  III.  A Stay is Inappropriate, as Applied to the Libel Claims ...........................................20

CONCLUSION .............................................................................................................21

# TABLE OF AUTHORITIES

*Acquisto v. United States*, 70 F.3d 1010, 1011 (8th Cir. 1995)....................................13

*Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941 (D.C. Cir. 1986)..............14

*Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7 (D.D.C. 2003) ........................................14

*Bartko v. United States DOJ*, 102 F. Supp. 3d 342, 349 (D.D.C. 2015)....................13

*Bartko v. United States DOJ*, 898 F.3d 51, 76 (D.C. Cir. 2018) ...............................13

*Career Educ., Inc. v. Dep't of Educ.*, 6 F.3d 817, 820 (D.C. Cir. 1993)...................13

*Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 90 (D.D.C. 2013) .....................13

*FTC v. Standard Oil Co. of Cal*, 449 U.S. 232, 241 (1980).......................................14

*Hernandez v. United States*, 38 Fed. Cl. 532, 536 (Ct.Fed.Cl. 1997)............................13

*Jobs, Training & Servs. v. East Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995)......14

*Meredith v. Fed. Mine Safety and Health Review Comm'n*, 177 F.3d 1042, 1047 (D.C. Cir. 1999) ..................................................................................................................................14

*Penland v. Mabus*, 78 F. Supp. 3d 484, 494 (D.D.C. 2015)........................................13

*Pratt v. Alameida*, No. C 03-2536 JF (PR), 2008 U.S. Dist. LEXIS 64682 (N.D. Cal. 2008) .....14

remedy *Jones v. FCC*, No. 95-1572, 1996 U.S. App. LEXIS 26152 (D.C. Cir. 1996)...............14

*Role Models Am., Inc. v. White*, 317 F.3d 327 (D.C. Cir. Feb. 4, 2003)....................14

*Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)................14

*Wilson v. James*, 139 F. Supp. 3d 410, 433 (D.D.C. 2015)........................................13

**LIST OF ACRONYMS**

USFF – United States Fleet Forces Command

SECNAV – Secretary of the Navy

ASN M&RA – Assistant Secretary of the Navy for Manpower and Reserve Affairs

FNAEB – Field Naval Aviator Evaluation Board

LSO – Landing Signal Officer

IP – Instructor Pilot

ISIC – Immediate Superior in Command

IG – Inspector General

POGO – Project on Government Oversight

CDI – Command Directed Investigation

VFA – Strike Fighter Squadron

## PRELIMINARY STATEMENT

The complaint at bar is a blatant and incompetent effort by a failed Naval Aviator, LT Steven Shaw, to have this Court delay or prevent the U.S. Navy from ensuring both good order and discipline, as well as safety of flight in the Naval Aviation Community.  Despite the utter lack of jurisdictional basis to bring this dispute to federal court, LT Shaw has improperly used this Court as a forum to publicly defame several high-ranking and well-respected officers (and one civilian attorney) while attempting to hide behind the litigation privilege. This request for a stay only further demonstrates the meritless and improper purpose behind this lawsuit.

This motion is a ploy by Plaintiff to avoid litigating the fact that the complaint is based on either an intentional omission or willful blindness of the factual basis.  Plaintiff's original theory of the case was that U.S. Fleet Forces Command ("USFF") should be prevented from investigating him for serious misconduct regarding the protection of classified materials, and teaching young aviators unauthorized methods for landing on an aircraft carrier that is likely to cause death and millions of dollars in damage, because it violated the spirit of an order from the Secretary of the Navy ("SECNAV") invalidating a prior investigation because of alleged improprieties.  However, Plaintiff's complaint completely omits the fact that SECNAV's order specifically authorizes the USFF investigation.

Plaintiff drafted a motion to stay the proceedings in response to being confronted on this material omission, as well as efforts by Defendant to proceed expeditiously to discovery. Plaintiff's papers are predictably weak on any supporting cases or statutory provisions, as none exist to support the relief sought.

Perhaps the most troubling aspect of Plaintiff's papers is that the factual basis for his claim is unworthy of belief - that he did not know that the USFF investigation was authorized at the time

he filed the lawsuit.  It is unfortunate that Plaintiff's counsel, Eric Montalvo, also chose to put his personal credibility at issue by making materially false statements to the Court at the initial appearance and, upon being confronted with the falsity of those statements, has explicitly refused to honor his ethical responsibilities to correct those false statements to the tribunal.

## STATEMENT OF FACTS

### Background

Plaintiff is a young, relatively inexperienced, F/A-18 pilot with a demonstrated track record of retaliating against senior Navy leadership that disagree with him, and then using the media in an attempt to publicly undermine his superior officers while falsely painting himself as the hero that the Navy should be listening to.  This pattern began around the time that he graduated from the U.S. Naval Academy and penned a column for the Capital Gazette, complaining that the Naval Academy had failed to rewrite their Honor system in the way that Plaintiff wanted them to.[1]

LT Shaw went on to flight training and ultimately, after qualifying to fly the F/A-18C Hornet, LT Shaw was assigned to VFA-131.  Despite his limited experience, he decided to write a white paper called "Ball Flying for F-18 Pilots," where he espoused a completely untested, unauthorized, and dangerous method of using an instrument called the Velocity Vector Indicator as a primary tool for lining up an approach to land on an aircraft carrier.  However, rather than submitting his white paper to Naval Air Systems Command to test and evaluate, he instead began sharing this document with other junior aviators who began testing his theories with near catastrophic results.

---

[1]       https://archive.is/20140201064011/http://www.capitalgazette.com/news/guest-column-naval-academy-honor-concept-strays-from-roots/article_f3b4151b-da04-5df1-a047-f3e1ef525d85.html

After several scary wave-offs and one near ramp strike, the Landing Signals Officers ("LSO")[2] and leadership discovered that these junior aviators were dabbling in LT Shaw's theory, rather than following the prescribed method of carrier landings.  On August 22, 2016, the air wing LSO sent a message to the LSO School to report on LT Shaw's activities and the potentially deadly consequences:

> We crushed a Hornet JO - he wrote a 9 page manifesto on velocity vector gouge and ball flying.  We had just found out about it, but we quickly found out it was circling amongst some of the Airwing JOs.  Boxxx has a video of a pass from a JO in that squadron, apparently under the tutelage of the manifesto-writer, that we will get to you.  Not sure how Boxxx kept him off the ramp - truly scary vision.  Don't worry, the last page of the manifesto was an appendix that calculated the angle an aircraft would have to maintain to fly straight into the round down from the start (no, I'm not joking). This may be the only accurate section in the entire document - but I'm not going to test it out for you.

One week later, LT Shaw was detached from VFA-131 and sent home for medical treatment after injuring himself during an alcohol fueled port visit.  However, the LSO leadership took action to ensure that all LSOs were on the lookout to ensure that no other aviators were following LT Shaw's landing technique.  Although they kept his identity anonymous, the incident was reported in the September 2016 LSO newsletter, which was transmitted to all LSOs fleet wide.

LT Shaw was next assigned as an instructor pilot at VFA-106, the fleet replacement squadron that trains new aviators how to fly the F/A-18E/F Super Hornet.  He missed the first several months to recover from his knee injury, but once he returned to full duty, he made little to

---

[2] The landing signal officer's primary responsibility is the safe and expeditious recovery of fixed-wing aircraft aboard ship. The employment of high-performance aircraft and the necessity for all weather operations have placed ever increasing demands on the LSO's skill and judgment. Through training and experience, he is capable of correlating factors of wind, weather, aircraft capabilities, ship configuration, pilot experience, etc., in order to provide optimum control and assistance in aircraft landings. The LSO is also directly responsible for training pilots in carrier landing techniques. In this regard, he must constantly monitor pilot performance, schedule and conduct necessary ground training, counsel and debrief individual pilots, and certify their carrier readiness and qualification. The pilot and LSO form a professional and disciplined team, both ashore and afloat. The LSO strives to develop the pilot's confidence, judgment, maximum effort, technical proficiency, and personal interest. The pilot must rely on the LSO's experience and ability to prepare him for optimum effectiveness as a carrier pilot.

no effort to get his qualifications to serve as an Instructor Pilot ("IP").  Instead, he focused his efforts on finding complaints that he could file against the squadron, while secretly teaching students the same prohibited carrier landing techniques that had nearly killed his squadron mate at VFA-131.

## The Complaints

LT Shaw sought out opportunities to file complaints against his command.  He searched the list of students who had failed to qualify and reached out to the only two African Americans on the list with an enticing offer, he would assist them with filing complaints alleging racism against the squadron and potentially give them another shot at their dreams of becoming fighter pilots.  Although he never instructed either student (and one had left the squadron well before LT Shaw arrived), he helped them weave a tale of racism that was completely unsupported by the evidence and unsupported by any of the African American instructors at the squadron.  When his complaints failed to achieve the desired results, LT Shaw took these false claims to both Senator Warner's office and the media.  Although he successfully got a profile in military.com about the alleged racism at VFA-106, and his own fake prowess as an instructor, the investigations failed to produce any evidence of bias in these students' failures to perform.  After the article was released, at least one of those students admitted that he knew he was disenrolled because he had difficulty keeping up with his peers, not because of any racism.  After an investigation, it was determined that these two students were disenrolled because of sustained substandard performance and were unable to complete the fighter syllabus successfully.  However, some of the instructors failed to treat the students with proper dignity and respect.  Changes were immediately implemented to ensure that no future problems would occur.

Similarly, LT Shaw looked for a complaint to file targeting the LSOs, who had crushed his dangerous carrier landing technique. He seized on a longstanding and voluntary tradition of "bottle bets," whereby students could make friendly bets with their LSO instructors on whether they would pass their qualifications. LT Shaw manufactured claims that he had been approached by several students to complain and that he had attempted to discuss the matter with several instructors to correct it, but without avail. Both of these claims are false, as LT Shaw acted alone and made no efforts to give the command the opportunity to correct any improprieties. Although he had the option to remain anonymous, LT Shaw elected to become the named complainant.

Unfortunately for LT Shaw, the Inspector General found "that the allegation involves a command matter for which ISIC oversight and resolution, rather than IG inquiry, is appropriate." Thereafter, the command took positive actions to ensure that the traditional practice was reigned in and made clear that it was an optional exercise, thus ensuring that it was conducted legally and ethically. LT Shaw refused to accept that his efforts to attack the LSO community[3] had failed to produce the retaliatory results he sought, so he brought the matter to Senator Warner's office to escalate an already resolved matter. Eventually, Commander of Naval Air Forces put out a message to cease all bottle bets. Thereafter, LT Shaw revealed himself to the command as the complainant.

LT Shaw pushed these complaints for the sole purpose of attacking the command and particularly the LSOs, while ensuring that everyone knew that he was behind them so that he could use whistleblower protected status to immunize himself from any accountability.

---

[3] It is important to understand that carrier landing training is a matter that LT Shaw had absolutely no involvement with. As he never tried to become an LSO, he is ineligible from even becoming qualified to teach carrier landings. He therefore was not involved in any of the carrier landing training or execution and was not present or involved in any of the bottle bet activities.

**LT Shaw's Dangerous Misconduct**

Throughout his tour at VFA-106, LT Shaw made little effort to get qualified to teach any phase of instruction.  Rather than spending time getting qualified to teach the approved syllabus, he devoted his efforts to creating an entirely new syllabus, spending hundreds of hours drafting papers, exercises, presentations, videos, and drawings.  Much of the techniques included in his syllabus are unproven, overly simplistic, or downright dangerous ways to fly the Super Hornet. The centerpiece of his unauthorized curriculum is, of course, the dangerous carrier landing techniques that had almost killed his shipmate at VFA-131.  However, rather than submit this syllabus through the proper channels of the Navy for review and potential approval to be used as part of the official syllabus, LT Shaw concealed these lessons from all the qualified instructors and aviators. Instead, he secretly provided it to the impressionable and inexperienced students.

In addition to providing unauthorized and dangerous training to students, while he, himself was unqualified to work as an instructor, LT Shaw began sneaking a camera into the simulator building to film himself performing experimental maneuvers in the simulator.  This is highly illegal, as the simulator building is a secure facility that houses classified materials.

**Accountability vs. Retaliation**

When squadron leadership stepped in to try to hold LT Shaw accountable and ensure that his actions did not result in student deaths, LT Shaw filed several more Inspector General Complaints claiming retaliation.  Unfortunately, the case was assigned to a disgruntled former Naval Flight Officer and inept investigator, David Ursini, who conducted an extraordinarily incompetent investigation.  Despite a complete lack of evidence supporting LT Shaw's claims and a mountain of exculpatory material, Mr. Ursini wrote a report concluding that LT Shaw had been retaliated against by his squadron leadership.

AS discussed more fully in the complaint filed against Mr. Ursini, which was included as Exhibit 3 to Plaintiff's Motion for a Preliminary Injunction, this report failed to properly address the issue of causation.  It is undisputed that LT Shaw made protected communications and it is undisputed that there were adverse personnel actions taken against him.  There is no evidence that these two situations are linked, as the adverse personnel actions all required based on squadron leadership's obligation to ensure safety of flight and to address misconduct by LT Shaw unrelated to his protected communications.  Rather, the actions taken were authorized and lawful, pursuant to subparagraph (b)(2)(C) to 10 USC § 1034:

> Nothing in this paragraph shall be construed to limit the ability of a commander to consult with a superior in the chain of command, an inspector general, or a judge advocate general on the disposition of a complaint against a member of the armed forces for an allegation of collateral misconduct or for a matter unrelated to a protected communication. Such consultation shall provide an affirmative defense against an allegation that a member requested, directed, initiated, or conducted a retaliatory investigation under this section.

At this point, the squadron leadership hired civilian attorney, Defendant Timothy Parlatore, to represent them.  A rebuttal submission was prepared that eviscerated Mr. Ursini's report, leading the Marine Corps to file a Report of No Misconduct against the Executive Officer of VFA-106, LtCol Nesbitt.  The original squadron commander, CDR Weyenberg was given a Non-Punitive Letter of Caution, while the commander who replaced him, CDR Scott was completely exonerated.

## Agency Action

Undeterred, LT Shaw pushed his case to Congress, where he deceived Congresswoman Elaine Luria to write to the Secretary of the Navy demanding that LT Shaw be put back on flight status.  He also deceived other elected officials and non-profit, Project on Government Oversight ("POGO") to advocate on his behalf.

10

Ultimately, under the political pressure that LT Shaw had brought to bear, the Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN M&RA") issued an order blindly accepting the obviously deeply flawed findings of Mr. Ursini, without making any effort to hear the other side of the story.  He ordered that LT Shaw's service record be sanitized of all adverse effects of his misconduct and that the squadron leadership be evaluated for whether their retirement should be reduced as a result.  ASN M&RA gave LT Shaw everything that he wanted, except for one thing.  He set parameters to limit the scope of any re-investigation of LT Shaw, while LT Shaw wanted him to prohibit the Navy from ever investigating him or holding him accountable for placing lives at risk and potentially compromising classified materials.

### LT Shaw Files a Frivolous Lawsuit

In a desperate effort to delay or avoid the investigation into his misconduct, LT Shaw has filed the instant lawsuit.  His complaint contains numerous material misstatements of fact and incomprehensible legal claims.

One of the most offensive and malicious aspects of the complaint is LT Shaw's opportunistic claims of a racist conspiracy.  Knowing the stigma and potential publicity that attaches to one who is branded a racist, LT Shaw intentionally and falsely presents the complaint as a tale of racism in VFA-106 and in Naval Aviation.  While there is room for improvement in certain areas, the tale of racism told by LT Shaw is wholly invented.  In fact, the investigations revealed that none of the African American instructors concurred with LT Shaw's claims about racism at VFA-106.

These outrageously false claims were made as part of LT Shaw and his attorney's despicable efforts to use this lawsuit as a publicity stunt.  LT Shaw attempted to have this case reported in the media and even brought a publicist with him to Court at the initial appearance on

the preliminary injunction.  After the Navy Times did report on the case, Plaintiff's counsel posted the article on his firm's website and promoted the article on social media with the hashtag #racism.

In an effort to silence the opposition, LT Shaw also sued the civilian attorney representing his squadron leadership on an inept libel theory, while moving for a preliminary injunction seeking a prior restraint on both the attorney's First Amendment rights, as well as to prevent him from advocating on his clients' behalf.

During the oral arguments on this preliminary injunction, LT Shaw's attorney, Eric Montalvo, made several material misrepresentations to the Court.  For example, Mr. Montalvo told the Court a story about how he had cross-examined LtCol Nesbitt at a prior administrative hearing when, in fact, there was no such cross-examination.  He also falsely claimed that LT Shaw had received a Navy Achievement Medal for teaching his dangerous carrier landing technique, when the citation clearly shows this to also be untrue.[4]

### Plaintiff's False Jurisdictional Claims Unravel, Leading to This Motion

Among the many misstatements in the complaint is the claim that Navy leadership, by initiating an investigation against him, has violated the spirit of ASN M&RA's order invalidating all actions that had been taken against him, while ignoring the fact that ASN M&RA explicitly authorized the second investigation.

On February 20, 2020, Defendant Parlatore sent an email to Plaintiff's counsel, saying:

> In your APA claims, you alleged that "The initiation of a second CDI, after the first CDI covering the exact same scope had been ordered set aside by Defendant Modly, is not only in direct contradiction to Defendant Modly's orders, but is arbitrary, capricious, and an abuse of discretion."  The inclusion of this passage is odd, considering the actual content of ASN Slavonic's order.  I also note that, although you had a copy of ASN

---

[4] These issues will be more fully briefed for the Court in the upcoming motion for sanctions, pursuant to Fed.R.Civ.P. 11, however, they are included briefly here both to complete the statement of facts, as well as to provide the Court with a frame of reference when evaluating Plaintiff's false claims that they did not know of the contents of ASN M&RA's letter at the time of filing.

> Slavonic's letter, which was an exhibit to my letters to the congressional reps, you chose to rely on an email from Warner's office instead, which failed to mention that ASN Slavonic's letter specifically authorizes the second CDI, designates USFF as the convening authority for the second CDI, defines the scope and imposes certain restrictions on that investigation.

Upon being confronted with the fact that Plaintiff's entire jurisdictional claim to bring this matter to Court was based on a misrepresentation of the Order, Plaintiff refused to engage in discussions about dismissing this frivolous action and instead chose to file a motion to stay.

## LEGAL STANDARD

Plaintiff seeks to stay these proceedings based on his claim that he has failed to exhaust administrative remedies.  There are no applicable statutory provisions for this request and case research does not reveal a single case where a Plaintiff sought a stay, over defendants' opposition, in an effort to cure their own failure to exhaust administrative remedies.  Instead, the case law primarily focuses on whether such a failure should result in a dismissal.

5 U.S.C. § 704 only permits judicial review of a "final agency action." As Judge Mehta wrote:

> There can be little doubt that, where Congress and the DOD have developed such a comprehensive scheme to address allegations of retaliatory conduct, an aggrieved member of the military, like Plaintiff, must first exhaust administrative remedies before coming to federal court and seeking review under the APA.

*Wilson v. James*, 139 F. Supp. 3d 410, 433 (D.D.C. 2015); *see also Hernandez v. United States*, 38 Fed. Cl. 532, 536 (Ct.Fed.Cl. 1997)(concluding that the MWPA "affords members of the armed forces solely administrative remedies"); *Acquisto v. United States*, 70 F.3d 1010, 1011 (8th Cir. 1995); *Career Educ., Inc. v. Dep't of Educ.*, 6 F.3d 817, 820 (D.C. Cir. 1993) (requiring exhaustion "in order to give the Department's top level of appeal an opportunity to place an official imprimatur on the Department's interpretation of its regulations before it is reviewed by a federal court");

13

*Penland v. Mabus*, 78 F. Supp. 3d 484, 494 (D.D.C. 2015) (holding with respect to the MWPA that, "when Congress has established a specific form of redress, it precludes alternative fora"); *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 90 (D.D.C. 2013) (stating that "if the APA and/or an agency rule provides for a review process, an aggrieved party must exhaust that process before seeking judicial review").

Plaintiff cites to dicta in *Bartko v. United States DOJ*, 102 F. Supp. 3d 342, 349 (D.D.C. 2015) for the proposition that "courts typically stay judicial proceedings pending the outcome of the administrative-appeal process out of concerns for maximizing judicial economy."  However, the Court in Bartko, which was examining the denial of a FOIA public interest fee waiver, declined to stay the proceedings ruling that the Plaintiff was not entitled to a fee waiver.  Interestingly, the D.C. Circuit then reversed, ruling that Plaintiff was entitled to a public interest fee waiver, all of which was litigated without either exhaustion of administrative remedies or a stay. *Bartko v. United States DOJ*, 898 F.3d 51, 76 (D.C. Cir. 2018).

Stays are only appropriate for failure to exhaust administrative remedies in cases where the parties agree to a stay.  Absent that agreement, dismissal is the appropriate remedy *Jones v. FCC*, No. 95-1572, 1996 U.S. App. LEXIS 26152 (D.C. Cir. 1996)(granting Defendant's motion to dismiss for failure to exhaust administrative remedies and denying Plaintiff's motion to stay as moot); *Pratt v. Alameida*, No. C 03-2536 JF (PR), 2008 U.S. Dist. LEXIS 64682 (N.D. Cal. 2008)(denying Plaintiff's motion for a stay and dismissing the case for failure to exhaust administrative remedies).

Moreover, a decision to authorize an investigation is not reviewable by the U.S. District Court.  As Judge Walton explained in *Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7 (D.D.C. 2003):

> When agency action is considered final under the APA is well established in the law. In determining finality, the question the Court must ask is

whether the agency has imposed an obligation, denied a right, or fixed some legal relationship.  It is clear that generally an investigation is not a definitive statement of position but only represents a threshold determination that further inquiry is warranted. Thus, an agency's initiation of an investigation [in and of itself] does not constitute final agency action. As noted by the Fifth Circuit in *Jobs, Training*, "an attack on the authority of an agency to conduct an investigation does not obviate the final agency action requirement. Normally, the plaintiff must await resolution of the agency's inquiry and challenge the final agency decision.

*Id.* At 11, *quoting Role Models Am., Inc. v. White*, 317 F.3d 327 (D.C. Cir. Feb. 4, 2003);

*Meredith v. Fed. Mine Safety and Health Review Comm'n*, 177 F.3d 1042, 1047 (D.C. Cir. 1999);

*FTC v. Standard Oil Co. of Cal*, 449 U.S. 232, 241 (1980); *Jobs, Training & Servs. v. East Tex.*

*Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Veldhoen v. United States Coast Guard*, 35

F.3d 222, 225 (5th Cir. 1994)); *see also  Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941

(D.C. Cir. 1986)("It is firmly established that agency action is not final merely because it has the

effect of requiring a party to participate in an agency proceeding")

**ARGUMENT**

**I.     A Stay is Inappropriate Because the Proffered Administrative Remedy that Plaintiff Failed to Pursue is Inapplicable**

Plaintiff desires a stay so that he can pursue an appeal with the Secretary of Defense

("SECDEF"), pursuant to 10 U.S.C. §1034(h).   However, the desired appeal is entirely

inapplicable since ASN M&RA already ordered all the relief Plaintiff could possibly seek, and the

only portion that Plaintiff is not satisfied with is unappealable.

Under 10 U.S.C. §1034(f), upon the submission of a report from the Inspector General that

substantiates[5] a claim of restriction or retaliation, a service secretary "shall determine whether

corrective or disciplinary action should be taken" and, if the substantiated claim was for retaliation,

---

[5] Oddly, the statute presumes that the determinations of the Inspector General are infallible and provides little to no discretion for a service secretary.

a service secretary is required to correct the record of any prohibited adverse personnel actions. Subsection (h) gives the whistleblower the opportunity to appeal to the SECDEF if they are not satisfied with either the "corrective or disciplinary action."

The portion of ASN M&RA's letter that Plaintiff now claims he wants to appeal is unappealable, as the statute only provides that option for "corrective or disciplinary action." Plaintiff disagrees with ASN M&RA's order to limit the scope and ensure neutrality in any subsequent investigation into the misconduct of LT Shaw.  However, these ordered prophylactic measures are to protect LT Shaw and are neither disciplinary nor corrective in nature.

Essentially, LT Shaw is advancing a theory that because he was able to convince an inept investigator to submit a deeply flawed report of retaliation, the Navy should be prohibited from trying to find out the truth about whether LT Shaw is teaching dangerous techniques that are likely to cause death, as they nearly did at VFA-131.  Our Navy leadership would be derelict in their duties if they were aware of this significant safety risk and blindly put LT Shaw back on flight status without conducting a new and neutral investigation.

## II.     A Stay is Being Sought for an Improper Purpose, Based on a Misrepresentation of the Facts

The factual basis for this application is that Plaintiff claims to have been unaware that ASN M&RA authorized USFF to conduct a second investigation.  However, this claim is belied by both the exhibits to Plaintiff's motion for a Preliminary Injunction, media reports about this case, and even the exhibits to the motion for a stay.

Simultaneous to filing the complaint, Plaintiff filed a motion for a preliminary injunction, which contained several exhibits.  One of those exhibits was a letter Defendant Parlatore wrote to Congresswoman Elaine Luria (D-VA).  In this letter, which Plaintiff included as an exhibit,

Defendant Parlatore laid out explicitly all the facts that Plaintiff now claims to have been ignorant

of:

> Although ASN M&RA provided that a new investigation could be done, he set restrictive parameters on any such investigation, effectively influencing the outcome to LT Shaw's benefit.  First, he completely removed the Naval Aviation community from the process, giving sole authority to initiate an investigation to USFFC (currently commanded by a Surface Warfare Officer) and preventing any Aviator or Naval Flight Officer from being assigned to assist in the investigation.
>
> Moreover, Assistant Secretary Slavonic has directed actions that are intended to influence any witness statements by directing that they "must be informed that any previous statements made by them for the purposes of the CDI will not be used in the CI."  As it has become common knowledge that ASN M&RA has reversed all actions as they relate to LT Shaw, this admonition is likely to send an inappropriate message to witnesses that since Assistant Secretary Slavonic didn't like the results of the CDI, he would like them to change their statements.  If he were truly looking for witnesses to tell the truth, perhaps a more appropriate admonition would be to say that "investigators should request witnesses tell the full and truthful story, even if they believe they have already told it to the CDI investigator."
>
> Finally, Assistant Secretary Slavonic has improperly restricted the scope of any inquiry that USFFC may order to "(1) Whether LT Shaw, without authorization, recorded F/A-18 TOFT training sessions; and (2) Whether LT Shaw was conducting unauthorized training (such as Velocity Vector), or was otherwise training outside of phase."

Docket 2-5, p. 12-13.

Given that the above language was included in the papers that Plaintiff submitted to the

Court contemporaneously with filing the complaint, it defies credulity for Plaintiff to now claim

that "At the time Lt. Shaw commenced this lawsuit, he was still unaware that ASN (M&RA) had

authorized the second command directed investigation."

In his moving papers, LT Shaw completely glosses over this fact, attempting to blame

POGO for only forwarding him Defendant Parlatore's letter to Rep. Luria, but not the exhibits.

However, Fed.R.Civ.P. 11 requires that an attorney make a reasonable inquiry prior to filing papers

with the Court.  Plaintiff's exhibits and arguments demonstrate that absolutely no such effort was ever made:

    a.   Despite clearly maintaining regular contact with Rep. Luria's office, Plaintiff has not submitted any documents showing an effort to get the full letter and enclosures from her office.

    b.   Plaintiff chose not to include as exhibits any of the emails with POGO, which would theoretically support the claim that the exhibit was withheld until February 20, but likely contradict their claims.  Certainly, Plaintiff made no efforts to ask POGO to provide the exhibits prior to filing the lawsuit.

    c.   Counsel for the Plaintiff never made an effort to communicate with Defendant Parlatore prior to filing, either to try to discuss the alleged libel statements or to ask for a copy of the documents.

    d.   The exhibits provided by Plaintiff demonstrate that no effort was made to learn the contents of ASN M&RA's letter from USFF.

This last point warrants further discussion, as Plaintiff has included several exhibits with seemingly no relevance to the motion for a stay, other than as a vehicle to publish defamatory statements about Defendant Parlatore's clients.  Plaintiff attempts to justify their inclusion with the obtuse statement:

> As reflected in PE 3 (page 2) and PE 5, undersigned counsel continually pursued the scope and authority behind the second command directed investigation and was simply informed by Navy personnel that "US Fleet Forces convened the investigation" not that ASN (M&RA) had authorized its conduct and scope and at no time provided the supporting Letter.

However, this weak-kneed justification is belied by comparing the contents of those communications to the claims Plaintiff has made in his complaint.  Plaintiff has filed a lawsuit

alleging that the commencement of the investigation by USFF was "in direct contradiction" to ASN M&RA's order. Yet, in all of Plaintiff's efforts to convince USFF to stop their investigation, this issue was never raised. If Plaintiff truly believed that it was "in direct contradiction" to ASN M&RA's order, that would have been the first argument raised. On information and belief, Plaintiff never raised this argument with USFF because it was never an issue. It only became an issue when Plaintiff needed to concoct a jurisdictional basis to bring this frivolous case to the U.S. District Court.

If there was any remaining doubt on this issue, one has only to read the Navy Times article about this lawsuit to see that, not only was ASN M&RA's decision about the second investigation reported in the media, but Mr. Montalvo, counsel for the Plaintiff, even commented on it:

> Fleet Forces got roped into Montalvo's lawsuit because Slavonic took the investigation into Shaw's alleged misconduct out of the hands of naval aviators and gave it to Adm. Grady's Norfolk-based command.
>
> He tasked Grady's Fleet Forces solely with determining if Shaw unlawfully recorded simulator sessions or conducted unauthorized training, including the allegedly dangerous Velocity Vector techniques, to students.
>
> To Montalvo, however, this supposedly new "clean investigation" isn't clean at all because it still has the dirty fingers of the Navy all over it and he wants it stopped.

After publication, counsel for the Plaintiff published a copy of the article on their website and promoted it through their social media accounts. It is impossible for Plaintiff's counsel to still credibly maintain that they did not know, unless he is admitting that they willfully violated Fed.R.Civ.P. 11's requirements to conduct a reasonable inquiry.

The evidence demonstrates that Plaintiff's motion for a stay is being presented primarily to avoid having to immediately dismiss the case outright. When presented with the undeniable fact that the entire jurisdictional basis of this case is based on a deliberate misrepresentation,

voluntary dismissal is the only appropriate and ethical choice for Plaintiff.  However, this would not serve LT Shaw's improper purpose of delaying the investigation into his misconduct.

### III.    A Stay is Inappropriate, as Applied to the Libel Claims

Plaintiff has leveled serious charges of dishonesty against Defendant Parlatore, a prominent attorney and Naval Academy graduate with an impeccable record for honesty.  Although Defendant Parlatore has moved aggressively to begin discovery, Plaintiff is predictably resisting those efforts.  The instant motion for a stay serves no legitimate purpose, as to the libel claims, and Defendant Parlatore has a legitimate interest in moving expeditiously to clear his name of these false claims.

Plaintiff's motion relies on the argument that "judicial economy will be maximized in this case through a stay," however Plaintiff has failed to articulate how that stay would apply to the libel claims.  Even if LT Shaw's desired administrative appeal were somehow successful, the libel claims would remain to be litigated, as any administrative decision by the SECDEF will have no effect on these claims.  All of the discovery and motion practice that Defendant Parlatore wants to move forward with now will still have to be conducted, regardless of SECDEF's decision and, as such, a stay will actually have the opposite effect of prolonging these proceedings and increasing the strain on judicial resources.

Plaintiff has failed to articulate a legitimate interest that he has in a stay, that would outweigh Defendant Parlatore's interest in ensuring an expeditious resolution of these claims.  Moreover, a stay would reward LT Shaw's frivolous behavior by prolonging the negative effects of his baseless allegations on Defendant Parlatore's legitimate efforts to advocate on behalf of his clients, who are fighting to save their careers against LT Shaw's baseless attacks in other forums.

## CONCLUSION

For all the reasons stated herein, Plaintiff's motion for a stay should be denied, together

with such other and further relief, as the Court deems appropriate

Dated: March 9, 2020
       Falls Church, Virginia



Respectfully submitted,


Timothy C. Parlatore, Esq.
*Defendant, Pro Se*
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com


CC:    All Counsel Via ECF

21