**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STEVEN E. SHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 20-410 (RDM) |
| v. | ) | |
| | ) | |
| | ) | |
| THE HONORABLE THOMAS MODLY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A STAY OF**
**PROCEEDINGS**

Plaintiff, Lieutenant (Lt.) Steven E. Shaw, respectfully submits this reply in support of

his motion. For the reasons set forth herein and those listed in his motion, ECF No. 9, Lt. Shaw

respectfully requests this Court order all proceedings in this matter be stayed pending resolution

of his appeal to the Secretary of Defense.

**AUTHORITY AND ARGUMENT**

**A.     Clarification of Factual Inaccuracies in Defendant Parlatore's Opposition**.

**1.     Attempt to Cover Up Systemic Racism**.

In concert with the continued retaliation against Lt. Shaw is the Navy's attempt to cover

up the racism that occurred at VFA-106. The EO complaints took over 1 ½ years to complete. In

late April, 2019, Captain (Capt) Ashley and Mr. Savage were informed the investigation was

complete, and ready for a debrief. Plaintiff's Exhibit 8. Captain Ashley's in-person debrief was

conducted by Commander (Cmdr.) Brandon Keith and Lt. Sarah Burkett, the Staff Judge

Advocate and Deputy Staff Judge Advocate for Vice Admiral (Vice Adm.) Miller. Mr. Savage's

debrief was conducted via a recorded phone call with the "Force" Judge Advocate and Cmdr.

Keith. Plaintiff's Exhibits 9-10.

During his debrief, Mr. Savage was profusely apologized to for the racism he suffered:

> I know it's been very difficult for you, and I understand your frustration with this entire process. So, again, my apologies, but at this point, we're going to provide you with the investigation. And we can be open about the entire affair. **Also, I just want to tell you that I'm sorry you had to go through everything you went through, because right up front, we are substantiating that you suffered discrimination at [unclear 00:00:42].**
>
> We believe what you and Captain Ashley [phonetic] alleged, and that will be substantiated. **We're sorry you had to go through that. It's inappropriate that that would be happening in this day and age in our Navy, and that also explains, though, what's been going on behind the [unclear 00:01:02] because everybody who's looking at this has been aghast at what was substantiated and what was found by our investigator.** And in this day and age, nobody should have to go through what you guys went through. It's just inappropriate.
>
> And what has been going on since we last contacted you, when we thought we were primed and ready to go, because of the media attention and the congressional attention that this has gotten, Air Boss owed it to his superiors to reach up and let them know it was coming. So this was pushed all the way up to the Chief of Naval Operations. So you know there's a very interest in this investigation, and that's why we had to hold off, because the investigation was sent up to him so he could personally review the investigation. And he himself actually is going to be directing sweeping after actions for naval aviation as a result of this.
>
> So a lot of what's been going on behind the scenes, since we had four-stars, the highest level of the Navy looking at this and basically trying to say what can we do to keep this from happening again. **You know, it's just a daunting problem, racism in our country, racism within the ranks, but again, we want to attack it and see what we can do to try to make sure that the future pilots and present pilots don't go through what you went through.**
>
> So, anyway, that's just a little background. There are sweeping corrective actions that the Air Boss will be directing, starting with

> directing administrative actions to be taken against the CO and XO
> of the VFA-106—or former CO and XO and against the instructor
> pilots.  That will happen at lower echelons.  We can't direct what to
> do.  Otherwise, we [unclear 00:02:55], but he's directed that some
> action be taken.

Plaintiff's Exhibit 9 (emphasis added). Captain Ashley received a very similar debrief, which

lasted for a little over an hour. Plaintiff's Exhibit 10.

Both Capt Ashley and Mr. Savage received documents that stated all of their allegations,

which included them being removed from training due to racism, were substantiated. Plaintiff's

Exhibits 11-12. To that end, when Capt Ashley conducted his debrief with CDR Keith, he

specifically read each one of the allegations to confirm that they had been substantiated; every

single one of the individuals in attendance replied in the affirmative, thereby confirming that

they had, indeed, been substantiated. Plaintiff's Exhibit 10.

The Tailhook convention, in which RADM Kelley made the comments regarding the

need to ensure all investigations involving alleged whistleblowers were "clean," took place

September 5-8, 2019.[1] The entirety of that panel exchange, with CDR Caponigro asking the

question and RADM Kelley answering, is of great import, and is included herein:

> CDR Joel Caponigro: Good afternoon, I'm, uh, Commander Joel
> Caponigro, call sign "Furious," Ops O at VFA-106 in Oceana. I
> have a question here that, uh, took some input to do, so I had to
> write it down. Um, what would you say to an entire generation of
> future CO's and current CO's, uh, JO's and Department Heads in
> the room who are watching the IG process used as a weapon for
> individuals that don't like their boss. In other words, why would
> you choose to stay in the Navy after watching anyone with
> protected communication completely wreak havoc on the safety
> process, while the O-5 leadership that's trying to do the right thing
> takes the fall for doing it. The perception that upper levels of
> leadership are not supporting at their subordinates in hopes that it

---

[1] *See* time stamp 1:39:00 – 1:44:00 at
https://livestream.com/wab/tailhook2019/videos/195959742 (last visited March 13, 2020).

just doesn't affect their careers is out there, and that's, they're not receiving support from the upper levels. Additionally, what efforts are being made to go after the important issues of good or-, good order and discipline, and to ensure that our O-5 leadership currently in command is supported to the fullest extent possible.

RADM Roy Kelley: Delicate question. Thank you much for it. So-

CDR Joel Caponigro: I'm not a delicate person (laughs).

RADM Roy Kelley: A cou-, ya, a couple of things that, uh, we can, we can talk about here. Obviously when it comes to, uh, the, the IG process, let, I want to make sure that everybody understands that, that is an independent organization. So, you know, if, if somebody in here says, uh, you know hey we're, we're concerned about leadership and where they're going with the IG, there is, uh, those are two different things completely. Okay, so, if we're talking about an IG that's happened, that is exclusive of the people you see up here. Okay? Independent organization. Does its own investigations, and uh, we, we have no connection, we have no, uh, uh, nothing that we can go back to change what their opinion is, or what their, their results are. Okay? So start with that. Now specifics on, on the cases that you're referencing, uh, obviously we're not gonna to dive into those. But, uh, I can tell ya, that, uh, we are, we are concerned about things that happened as a result of an IG, or somebody abuses the system; as uh, as you describe, using IG as a weapon. And, uh, those engagements with senior leadership to the IG are happening. Just to make sure they understand our concerns that we, we see happen; and to, uh, to try to see what they can do to put prevention things in place so that people aren't given the opportunity to abuse the system. So, the case that you're referencing, we're obviously not gonna talk the specifics to, but I do want make sure you understand that, that leadership is, uh, engaged on it, uh, with the IG, but also, leadership is, uh, in the middle of the process. So, what you're describing is not done. Uh, the, uh, the results, uh, will continue to be acted upon, and, uh, those will be resolved here in the near future.

4

> CDR Joel Caponigro: Yet it still takes down good people before decisions are made.
>
> RADM Roy Kelley: And, and…
>
> VADM DeWolfe Miller: No argument.
>
> RADM Roy Kelley:  And, and, you know, there's, there's gonna be some that, that, uh, will look at it that way for sure, and uh, I, I can't argue your point. What I will say is that there's, uh, um, investigations that happened, and the information in the investigations, we, uh, we have to protect, but at the same time, understand that anytime that we're involved in a situation like this, uh, anything you do, any actions you take can be viewed differently than you might have i-, indicated, or mi-, uh, the way that you might have approached it. So, you know, when, whenever we're, uh, we're given the responsibilities to take action for, uh, an investigation, or to follow-up, you have to understand that every individual is given their rights; and every opportunities if they want to engage with senior leadership outside organizations. Uh, and, and, we have to protect that. The other side of this too is we have to make sure if we're, we're, uh, tasked with doing anything in re-, in regards to that particular investigation, we gotta make sure we do it absolutely perfectly clean. I'll leave it at that.

Plaintiff's Exhibit 13.

On September 9, 2019, the day immediately following the conclusion of the Tailhook convention, instead of carrying out the prescribed appeal process in the governing regulations, VADM Miller reopened the EO investigations and assigned investigative authority to his subordinate RADM Kelley, who was to make an "independent determination." Capt. Ashley and Mr. Savage were advised that any finding of substantiation could subsequently become unsubstantiated. Indeed, on October 11, 2019, RADM Kelley unsubstantiated Mr. Savage's EO complaints. On December 26, 2019, (7 days after the Assistant Secretary authorized a second CDI into LT Shaw, RADM Kelley unsubstantiated Capt Ashley's EO complaints. The reason

listed for the unsubstantiation for both individuals was "no corroboration." Plaintiff's Exhibits 14-15.

Mr. Savage appealed the unsubstantiation to the Secretary, which had to be routed through ADM Grady. In his appeal, Mr. Savage brought to the Secretary's attention the debrief he received from Vice Adm. Miller's Staff Judge Advocate. In yet another attempt to cover the Navy's misconduct, Adm. Grady discredited the transcript by stating that "the staff judge's advocate's purported comments, if true, were incorrect. As discussed above, the findings of the command investigation do not support and *have never supported* a substantiated determination of discrimination based on race." Plaintiff's Exhibit 17.

2.    **Dangerous Misconduct**.

On or about 13 Feb 20 during the preliminary injunction hearing Mr. Parlatore stated the following, "[a]s far as the FNAEB is concerned, we don't have a copy of that." Transcript page 14 Line 5. In an email exchange between counsel on or about 14 March 20 Mr. Parlatore stated, *inter alia*, the following:

> I have a transcript of you telling Judge Moss that you cross-examined LtCol Nesbitt at the FNAEB, the FNAEB instruction saying that attorneys are prohibited from cross-examining witnesses at FNAEBs and a transcript of LtCol Nesbitt not being cross-examined by you or asked any questions about his notebook. I also have a transcript of you claiming that LT Shaw got a NAM for his velocity vector training method and the citation showing that not to be true.

In other words, Mr. Parlatore now has the FNAEB. This raises several questions which will be discussed *infra*.

3.    **Privacy Act and New Jersey RPC 1.2 (d)**.

The Privacy Act of 1974, as amended, 5 U.S.C. § 552a, prohibits the disclosure of a record about an individual from a system of records absent written consent of the individual,

unless the disclosure is pursuant to one of twelve statuary exceptions. If evidence is obtained in violation of Privacy Act it is the unlawful obtaining of evidence. The twelve statutory exceptions are:

> **(b)** CONDITIONS OF DISCLOSURE.—No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—
>
> **(1)** to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;
>
> **(2)** required under section 552 of this title;
>
> **(3)** for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;
>
> **(4)** to the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;
>
> **(5)** to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;
>
> **(6)** to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;
>
> **(7)** to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

**(8)** to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

**(9)** to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

**(10)** to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

**(11)** pursuant to the order of a court of competent jurisdiction; or

**(12)** to a consumer reporting agency in accordance with section 3711(e) of title 31.

The Privacy goes on to explain that there may be criminal penalties under certain circumstances:

**(i)** **(1)** **CRIMINAL PENALTIES.** Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

**(2)** Any officer or employee of any agency who will fully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

**(3)** Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

New Jersey RPC 1.2 (d) Scope of Representation and Allocation of Authority Between Client and Lawyer states the following:

> RPC 1.2 (d) A lawyer shall not counsel or assist a client in conduct that the lawyer knows is illegal, criminal or fraudulent, or in the preparation of a written instrument containing terms the lawyer knows are expressly prohibited by law, but a lawyer may counsel or assist a client in a good faith effort to determine the validity, scope, meaning or application of the law.

Lieutenant Shaw has neither been provided notice of any request for his FNAEB or executed written consent to release this document to Mr. Parlatore. No exception applies to Mr. Parlatore. One of Mr. Parlatore's clients, Cmdr. Brandon Scott, Lt. Shaw's previous commanding officer, was provided a copy of the report and "reviewed the Board's report" in his endorsement on the report to the Commander, Naval Air Forces Atlantic. Mr. Parlatore is not in lawful possession of Lt. Shaw's FNAEB report.

**4.   Libel**.

Mr. Parlatore has committed in an affidavit provided to this Court, *inter alia*, the following:

> 4. In addition to the claims Plaintiff raises against Navy leadership, the complaint accuses me of libel, related to two statements that I made in communications on behalf of my clients. However, despite Plaintiff's best efforts to misconstrue these statements, the inescapable fact is that **both statements were true**.
>
> 8. On February 13, 2020, we appeared before the Court to argue the Plaintiff's Motion for a Preliminary Injunction, Mr. Montalvo argued that my request that the Inspector General investigate whether Mr. Ursini had improperly provided documents to LT Shaw was knowingly false because months earlier, Mr. Montalvo had cross-examined LtCol Nesbitt about his notebook at an administrative hearing for LT Shaw's Field Naval Aviator Examination Board ("FNAEB"). Although Mr. Montalvo regaled this Court with a story about how his cross-examination led the board to find LtCol Nesbitt not credible, this entire episode was a complete fabrication. Mr. Montalvo never cross-examined LtCol

Nesbitt because FNAEBs do not permit attorneys to participate and cross-examine witnesses. Nobody at the board asked LtCol Nesbitt questions about his notebook, he never claimed that the notes were taken contemporaneously, and the board never made any determinations about LtCol Nesbitt's credibility. Moreover, Mr. Montalvo falsely claimed that, rather than prohibiting LT Shaw from teaching his dangerous landing method, he had actually received a Navy Achievement Medal for this teaching method. However, no such medal exists. In a case where Plaintiff is accusing an attorney of making false statements, it is unbelievable that Plaintiff's counsel begins the case by fabricating stories to tell the Court.

One of the statements, for example, Mr. Parlatore maintains is true is that, "[i]t is unknown how LT Shaw came to possess a copy of LtCol Nesbitt's notebook in the first place. It appears that he either unlawfully searched LtCol Nesbitt's office to make copies for himself or received copies from [the DoD IG]." Plaintiff's Exhibit 7. A review of the FNAEB report quickly dispenses with this allegation as found listed in the report at enclosure (42) "scanned pages of LtCol Nesbitt's counseling notebook." Plaintiff's Exhibits 1-3. Given Mr. Parlatore's access to this document, despite it being unlawful, he is certainly on notice that his allegation that Lt. Shaw "unlawfully searched LtCol Nesbitt's office" and reassertion via affidavit is simply false. Mr. Parlatore has admitted to *per se* libel and has attempted to mislead the Court. Upon receipt of Lt. Col. Nesbitt's notes (as appended to the FNAEB report), Lt. Shaw provided a copy to the DoD IG as evidence that Lt. Col. Nesbitt's alleged counseling's never took place.

5.    **Lt. Col. Nesbitt and Cmdr. Scott**.

Commander Brandon Scott, as discussed, was Lt. Shaw's commanding officer during the conduct of the FNAEB and Lt. Col. Nesbitt was his executive officer. The statements provided to the FNAEB by the senior leadership of his command were so unreliable they were purportedly not relied upon by the FNAEB. Mr. Parlatore unlawfully reviewed the FNAEB and yet persists

to assert in a declaration that this is a "fabrication" when he is directly confronted by the contrary

which is excerpted below from Opinion 2 of the board:

> The board noted discrepancies in some testimony and counseling
> records presented to the board...The board found that this date
> conflicted with LT Shaw's recollection and with squadron flight
> records. An additional discrepancy arose regarding the date of a
> phone call between Lt Shaw and CDR Scott…The specifics of
> these discrepancies are noted in the findings of the board…In order
> to simplify this matter, the testimony and counseling notes of
> LtCol Nesbitt and the command investigation's interview summary
> for CDR Scott were not considered by the FNAEB…

Plaintiff's Exhibit 1 at 3-4.

**6.     Dangerous Techniques**.

The "velocity vector" concepts raised as "dangerous misconduct" by Mr. Parlatore are

now incorporated into all operational Naval F/A-18E/F aircraft through the implementation of

the new Precision Landing Mode (PLM) software. The alleged most "controversial" concept is

that the ship's speed has consistent and predictable effects on the flight path angle of an aircraft

landing on an aircraft carrier. Not coincidentally, ship's speed is the primary data input required

from a pilot in the PLM software. There is no reasonable basis to assert misconduct regarding

this information when it is a critical component of operational aircraft and now implemented into

the software. Plaintiff's Exhibit 6.

**7.     Cross-Examination**

Mr. Parlatore was not present during the proceedings and has no idea how undersigned

counsel represented Lieutenant Shaw. Mr. Parlatore is correct that attorneys are generally not

able to participate in a traditional way during a FNAEB. It is an administrative proceeding. In

Lieutenant Shaw's case he was tasked with the questioning of witnesses and in particular – LtCol

Nesbitt. Undersigned counsel addressed the fact that it is inappropriate for a junior officer to

question a senior officer – particularly when they will be questioning the integrity of the officer

and the board insisted that Lieutenant Shaw was the one who could ask the questions. As is reflected in the board's opinion, I sat next to Lieutenant Shaw, provided him a list of questions to ask the witnesses, handed him the documents to ask questions on, and build the record of evidence. While Lieutenant Shaw was the mouth piece I was the one moving Lieutenant Shaw's lips and ensuring, to the best of my ability, the relevant information was produced. The board process was a hostile exchange both with the board members and witnesses. This is reflected in the direction that the board be set aside as derived from reprisal activity. While decorum was always maintained, I continued to persist in challenging the board and the evidence wherever and whenever I found it appropriate to do so. While the method of cross examination used in this administrative matter was unorthodox, it is what I was given and used in accordance with the restrictions placed upon me by the Board.

> In the opinion of the board, a respondent's willingness and ability to accept responsibility for any noted deficiencies is a necessity for remediation to occur. This can only be ascertained if the board members and respondent can communicate in a forthright manner. Throughout the FNAEB proceedings, LT Shaw conferred with his lawyer on a majority of the occasions before providing the board with his testimony. LT Shaw appeared to be evasive and deceptive on a few matters but the board could not discern if the lack of candor was due to providing coached answers derived from the advice of counsel.

Plaintiff's Exhibit 1 at 3. I would note for example at one point they asked Lieutenant Shaw to admit to a crime and I asked them if they suspected him of an offense whether they were going to read him his Article 31(b) rights. They moved on from that line of questioning after conferring amongst themselves.

     **8.**   **<u>Awards</u>**.

Lieutenant Shaw's enclosed example fitness report and Navy Achievement Medal highlight his skills and achievements relating to aircraft carrier landings, the focus of the vector

velocity concepts as discussed above and are also reflected as submissions for consideration during the FNAEB. Plaintiff's Exhibits 4-5. This is directly contrary to Mr. Parlatore's assertions.

**B.**      <u>**Lt. Shaw Need not Demonstrate Hardship or Inequity**</u>.

A showing of hardship or inequity by the movant need only be made when there is a fair possibility that the stay will "work damage to someone else." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Neither the Navy Defendants[2] nor Mr. Parlatore have shown that a stay will result in damage. ECF Nos. 11, 12.

Conceivably, the Navy Defendants could argue that a delay in the proceedings would simultaneously delay any follow on action. But this argument belies the true proponent, and victim, of delay in this case. It would appear, based on the history of this case, that any further delay would be detrimental to Lt. Shaw, not the Navy. Since May 2018, Lt. Shaw has been precluded from fulfilling his role as a pilot. He has been sidelined with no official duties or responsibilities, and remains unable to maintain pilot proficiency or achieve required flight hours. And, in the time since he learned the DoD IG would be investigating his case – in August 2018 – he has been subjected to a Human Factors Board, brought to Non-Judicial Punishment, had a Report of Officer Misconduct filed in his permanent record, had his access to classified information suspended (which prompted the Department of Defense Consolidated Adjudication Facility to recommendation revocation of his security clearance), removed from the promotion list for promotion to Lieutenant Commander, issued two adverse fitness reports, sent him to a Field Naval Aviator Evaluation Board (which has the authority to strip him of his Naval Aviator wings), and initially recommended for processing for separation from the Navy. All of this was

---

[2] The phrase "Navy Defendants" collectively refers to Defendants Modly, Grady, Miller, and Kelley.

based on the first unlawful command directed investigation. When it was found that the investigation, and all that stemmed from the investigation, was unlawful, the Navy then took an additional 6 months – which is 5 months longer than is statutorily permitted – before any action was directed. And, most importantly for purposes of this motion, the Navy *never* provided notice to Lt. Shaw that ASN Slavonic had authorized that second command investigation. The disposition letter is dated December 16, 2019; 4 months later, and the Navy *still* has not provided Lt. Shaw with official notice of this authorization. In fact, the Navy appears to have hid any indication that the authorization was made not only from Lt. Shaw, but inquiring Congressional members. Now, the Navy wants to subject Lt. Shaw to the same scope of investigation that was conducted nearly 2 years ago, despite there being *no* evidence that Lt. Shaw has committed the alleged misconduct either before, let alone after, the initial command investigation was conducted.

Lieutenant Shaw suffers no delusions that a stay would cause a temporary delay – a stay by its very nature requires the present proceedings to be temporarily suspended. However, this stay would not be indefinite (as the Navy Defendants insinuates). At most, the stay would be no longer than 90 days, if not less. First, the statute requires the Secretary of Defense to complete his review within 90 days of receipt of the appeal. *See* 10 U.S.C. § 1034(h) ("The Secretary *shall* make a decision to reverse or uphold the decision of the Secretary of the military department concerned in the matter within 90 days after receipt of such submittal.") (emphasis added). Second, as the date of this filing, Lt. Shaw has filed the appeal. Once it is confirmed received by the Secretary of Defense, the 90 day clock will begin to run. Unless the Navy Defendants have reason to believe the Secretary of Defense will violate this statutory prescription, then there is no significant concern regarding delay.

Similar to the Navy Defendants, Mr. Parlatore has not suggested how any delay might damage him. ECF No. 12. To the contrary, during the hearing of February 13, 2020, all parties agreed to remain on one briefing schedule. Absent any showing by the Defendants that they will suffer damage under a stay, Lt. Shaw need not demonstrate any hardship or inequity. Accordingly, and in line with the arguments in Lt. Shaw's motion, this Court should grant the requested stay for the statutorily prescribed period.

C.   <u>Review by the Secretary of Defense will Constitute Final Agency Action for Purposes of the APA</u>.

The Administrative Procedure Act (APA) permits judicial review of final agency action. 5 U.S.C. § 704. Final agency action occurs when "the agency has completed its decisionmaking process, and when the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (internal quotations and alterations omitted). While the MWPA does not provide a private cause of action, courts permit review of a service's disposition of substantiated acts of whistleblower reprisal under the APA. *Wilson v. James*, 139 F. Supp. 3d 410, 433 (D.D.C. 2015), *aff'd*, No. 15-5338, 2016 WL 3043746 (D.C. Cir. May 17, 2016). Review by the Secretary of Defense under 10 U.S.C. § 1304(h) constitutes final agency action under the APA. *Rodriguez v. Penrod*, No. 18-cv-00240, 2020 WL 686012, at *7 (D.D.C. February 11, 2020). Under the APA, an agency's decision can be set aside if it is "arbitrary, capricious, or not based on substantial evidence." *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1512 (D.C. Cir. 1989 (quoting *Chappell v. Wallace*, 462 U.S. 296, 303 (1983)).

D.   <u>ASN Slavonic's Disposition is Ripe for Review by the Secretary of Defense</u>.

The Defense Secretary is permitted to review any "disposition" the service member is unsatisfied with. 10 U.S.C. § 1034(h). This section is devoid of the words "corrective or disciplinary action." *Id.* Lieutenant Shaw is dissatisfied with ASN Slavonic's disposition

authorizing the second command investigation. Not only is the authorization arbitrary and capricious, as it runs afoul of the Secretary's statutory authority, but it constitutes continued reprisal and is steeped in unlawful command influence. For these reasons, Lt. Shaw's matter is ripe for review by the Defense Secretary; and, the Defense Secretary must review the matter before it can be judicially reviewed. It is Lt. Shaw's sincere hope that judicial review will be unnecessary, but he is unable to cross that bridge without first seeking the Defense Secretary's review.

The Navy Defendants' averment that ASN Slavonic's disposition by way of authorizing a second command investigation is not ripe for review by the Secretary of Defense because the authorization does not constitute "corrective or disciplinary action" under 10 U.S.C. 1034(f)(1), ECF No. 11 at 8-9, is misplaced. Lieutenant Shaw concurs that the authorization does not constitute "corrective or disciplinary action." In authorizing the second command investigation, ASN Slavonic went outside his statutory authority. The only two actions a Service Secretary may take are: (1) determining whether corrective or disciplinary action should be taken; and (2) if action is warranted, direct the appropriate corrective or disciplinary action that is to occur. The fact that the authorization is neither corrective nor disciplinary action renders it arbitrary and capricious, thereby necessitating further review.

## <u>CONCLUSION</u>

Wherefore, Lt. Shaw respectfully asks this Court to stay the proceedings so that he may administratively appeal his matter to the Secretary of Defense. A proposed order is attached.

Dated: March 16, 2020

Respectfully submitted,


_____/s/ *Eric S. Montalvo*_____
Eric S. Montalvo, DC Bar No. 993206
THE FEDERAL PRACTICE GROUP
1750 K Street N.W., Suite 900
Washington, D.C. 20006
Telephone: 202-862-4360
Facsimile: 888-899-6053
emontalvo@fedpractice.com

*Counsel for Plaintiff*

**Certificate of Service**

I hereby certify that on March 16, 2020, I filed the foregoing with this Court's Electronic

Filing System which caused the respective parties to receive an electronic copy.


                    /s/ *Eric S. Montalvo*
                  Eric S. Montalvo, DC Bar No. 993206
                  THE FEDERAL PRACTICE GROUP
                  1750 K Street, N.W., Suite 900
                  Washington, D.C. 20006
                  Telephone: 202-862-4360
                  Facsimile: 888-899-6053
                  emontalvo@fedpractice.com