IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____

STEVEN E. SHAW )
    1981 Grandon Loop Road )
    Virginia Beach, VA 23456, )
     )
    Plaintiff, )
     )
    v. )         CIVIL ACTION NO. 1:20-cv-00410-RDM
     )
THE HONORABLE THOMAS B. MODLY )
    Acting Secretary of the Navy )
    Department of the Navy )
    1000 Navy Pentagon, Room 4D652 )
    Washington, DC 20350, )
     )
TIMOTHY C. PARLATORE )
    Esquire )
    One World Trade Center, Ste. 8500 )
    New York, NY 10007, )
     )
    Defendants. )
_____

## FIRST SUPPLEMENTAL COMPLAINT

    Plaintiff, Lieutenant (Lt.) Steven Shaw, United States Navy ("Navy"), by and through

undersigned counsel, files this Complaint against the defendants, alleging as follows:

## PARTIES

1.  Plaintiff Lt. Shaw is an active duty officer in the Navy.

2.  Defendant Mr. Modly is the Acting Secretary of the Navy and is named in his official

    capacity as the head of the Department of the Navy (DON), which unlawfully provided

    information to Defendant Mr. Parlatore in violation of the Privacy Act.  *See* 10 U.S.C. §

    8013(a).

3.  Defendant Mr. Parlatore is the civilian attorney for Commander (Cmdr.) Martin Weyenberg,

Cmdr. Bryan Roberts, and Lieutenant Colonel (Lt. Col.) Michael Nesbitt, U.S. Marine Corps, three individuals who committed substantiated acts of whistleblower reprisal against Lt. Shaw. Mr. Parlatore unlawfully solicited information protected by the Privacy Act and committed libel *per se* when he published two statements falsely accusing Lt. Shaw of having committed a crime.

## JURISDICTION AND VENUE

4. This action is brought due to the DON's failure to comply with the Privacy Act. 5 U.S.C. § 552a(g).

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a case arising under the laws of the United States, and is brought under the Privacy Act, 5 U.S.C. § 552a(g). The relief requested herein is authorized under 5 US.C. § 552a.

6. This Court has supplemental jurisdiction over Lt. Shaw's state law claim against Defendant Mr. Parlatore under 28 U.S.C. § 1367.

7. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is the judicial district in which Defendant Mr. Modly is located and is where a substantial part of the events or omissions giving rise to the claim occurred.

8. This action is brought within 2 years of the wrongful disclosures in violation of the Privacy Act and 1 year of Defendant Parlatore publishing the defamatory statements per D.C. Code § 12-301(4).

## INTRODUCTION

9. The U.S. Navy was confronted by allegations of institutional racism against African American student pilots (SPs) and unlawful gambling between pilot instructors and students for alcohol during 2017. These allegations formed the bases of Equal Opportunity (EO)

complaints and Congressional Inquiries. One of the "whistleblowers" regarding these allegations was Lt. Shaw. Once the Navy learned Lt. Shaw was responsible for making this information available outside of the Navy, the Navy undertook a deliberate and far reaching scheme to undermine his credibility and destroy his Naval career through the pursuit of a retaliatory command directed investigation (CDI) and various administrative actions intended to strip him of a security clearance, his Naval Aviator wings, promotion, and reputation.

10. The Secretary of the Navy, after being confronted with the reprisal activity as substantiated by the Department of Defense (DoD) Inspector General (IG), on or about January 2020, directed that all of the adverse actions be rescinded which were premised on the corrupt CDI. The investigation process was corrupt in that the investigator was found to have written statements for witnesses and witnesses were found to have made false official statements in support of the adverse actions being pursued against Lt. Shaw. In addition, investigating officials confirmed that the allegations of racist activity were found to be substantiated, which was communicated via telephone, but when the report was written up they were determined to officially be unsubstantiated. The Secretary of the Navy also authorized another "clean" investigation be conducted on Lt. Shaw, focused on the same issues and witnesses with a caveat that neither the witnesses nor the investigator could rely on their previous statements. The campaign against Lt. Shaw was not confined to the official administrative actions but also through a surrogate, Attorney Parlatore, who represents the offending lower level commander, executive officer, and investigating officer, through the mass distribution of correspondence within the Navy and within Congress, which includes accusing Lt. Shaw of committing crimes without basis in fact or law.

## FACTUAL BACKGROUND

### Whistleblower Reprisal.

11. Lieutenant Shaw commissioned in the Navy in May 2009. In October 2016, he transferred from VFA-131 to VFA-106 at Naval Air Station (NAS) Oceana, Virginia, as an F/A-18 Instructor Pilot (IP).

12. Beginning in April 2017, Lt. Shaw became intertwined with the EO cases of two African American SPs in VFA-106. Both SPs were experiencing racial discrimination at the hands of numerous IPs and the chain of command at VFA-106. The extent of the racial discrimination, which resulted in the disenrollment of both SPs from the F/A-18 training pipeline,[1] was quite alarming, and included such acts as derogatory comments about the two in a WhatsApp communication group amongst IP graduates of the Naval Academy; this group referred to themselves as the "Pure Bloods." Lieutenant Shaw's involvement consisted of assisting the two SPs in drafting congressional inquiries and EO complaints, and correspondence with Senator Mark Warner's office on the matter.

13. In November 2017, Lt. Shaw was approached by numerous SPs regarding the illegal practice of gambling between pilot instructors and students in exchange for alcohol called "bottle bets" during the recent Carrier Qualification (CQ) phase of instruction, which are described as follows:

---

[1] Following completion of the EO investigation, one of the pilots was reinstated in training. *See* https://www.military.com/daily-news/2019/07/11/marine-pilot-will-get-2nd-shot-fighter-training-after-racial-bias-investigation.html (last visited December 10, 2019). The other pilot was discharged from the Navy prior to completion of the investigation. The EO investigations, which were previously substantiated by Vice Adm. Miller, have since been unsubstantiated by Rear Adm. Kelley following publication of DoD IG report of whistleblower retaliation, discussed herein. The appeals of those investigations are ongoing, and are the subject of a lawsuit in this Court under the Freedom of Information Act. Case No. 1-19-cv-02983-ABJ.

> Bottle bet wagers are wagers between the [Landing Signal Officer (LSO)] instructors and student pilots related to the student's performance (i.e., catching the target wire, maintaining a certain boarding rate, no technique wave offs or bolters) during CQ that were paid off with bottles of alcohol. The LSO instructor would grade the student's performance and inform them at the completion of the CQ as to the outcome of their bet.

One of the concerns besides the illegal gambling activity, fraternization between instructors and students, and fostering of a frat- like culture/ atmosphere of alcohol consumption within the Naval Air community, was that the practice was geared by the instructor LSO's to manipulate student performance given that the assignment of marks was entirely within their discretion.

14. Lieutenant Shaw filed a complaint with the United States Fleet Forces Command (USFF) IG office on November 3, 2017, informing that the bottle bets were being conducted in violation of 5 C.F.R. § 2635.301, "Gifts Between Employees." Attached to the IG complaint were several supporting documents, including correspondence informing the SPs that "[a]ll bets must be settled prior to receiving CQ stamp in logbook." The USFF IG forwarded the matter to the Commander, Naval Air Forces Atlantic (CNAL) IG, which then sent a copy of the complaint to the Commander, Strike Fighter Wing Atlantic, who in turn forwarded it to the LSO community; a large uproar resulted within VFA-106 and the LSO community, and the complaint was soon distributed across the entire fleet.

15. On December 15, 2017, the Executive Officer (XO) for VFA-106, Lt. Col. Nesbitt, held an all-instructor meeting, during which he said that "bets [bottle bets] are a naval aviation tradition, and if anyone wants to make bets, they can." He also publicly announced that there would be negative consequences for anyone who seeks redress through IG channels. With no

resolution being taken to discontinue the bottle bets, Lt. Shaw felt it necessary to elevate the issue to Senator Warner's office, which he did on December 19, 2017.

16. Senator Warner's office forwarded the matter to the Naval Inspector General (NAVINSGEN), and an IG investigation was opened. Upon best information and belief, Cmdr. Roberts, the former head of the LSO school and the individual who ended up serving as the IO for the CDI against Lt. Shaw, learned of the IG investigation, and sent correspondence to the CNAL (Rear Adm. Roy Kelley), the Commander, Naval Air Forces (CNAP/F) (Vice Adm. DeWolfe Miller), and the Chief of Naval Air Training (CNATRA) stating that he was "attempting to check" his emotions, but could not "hide [his] passion," and that he had "serious concerns" for the Navy's heritage, culture, and warrior ethos if it "len[t] credence to individuals that do not have the character or fortitude to address these issues in person."

17. On February 24, 2018, the CNAF, Vice Adm. Miller–the same individual who initially substantiated the EO investigations of the two African American SPs but then remanded them for further investigation allowing them to become unsubstantiated–released a message to all Naval Air forces terminating the practice of bottle bets. Vice Admiral Miller wrote, in part, that "practices like bottle bets with landing signal officers casts those in positions of leadership and mentoring as betting against the success of their charges … And practices where instructors expect to receive gifts from their students do not reflect who we are."

18. Upon receipt of Vice Adm. Miller's message terminating bottle bets, and upon best information and belief, Cmdr. Roberts wrote a rage fueled email encompassing his disdain for those who brought about the end of this practice, and insinuating that the command had cowed to Lt. Shaw's IG complaints. He concluded his email with, "Don't get me wrong; I'm

not trying to burn this place down. I want to burn the rest of the motherf*****'s houses down, so ours is the one left standing. The last beacon of hope and a safe haven for those that still believe in what we should stand for."

19. On March 6, 2018, Cmdr. Roberts composed another email stating "bottle bets are forbidden … after a malcontent VFA-106 core IP launched a Navy and congressional IG on tradition that dates back to straight decks on the Great Lakes. Giant can of worms that I'm considering on how to unleash on the world."

20. On April 4, 2018, an article regarding the racial discrimination against the two African American SPs Lt. Shaw previously assisted was published on *Military.com*. Lieutenant Shaw was quoted in the article expressing his belief that "the uniform nature of pilot culture creates a breeding ground for implicit biases of all kinds to take hold, including racial, gender, and even personality-based prejudice."  The article "drew the ire" of many of the IPs. Indeed, upon best information and belief, Lt. Col. Nesbitt was quoted saying, "I'm going to destroy him," which, to others, appeared to be a statement expressing his intent to retaliate against Lt. Shaw.

21. On April 5, 2018, Cmdr. Martin Weyenberg, then Commanding Officer (CO) of VFA-106, called Lt. Shaw to discuss the *Military.com* article and informed Lt. Shaw that he would be left off the flight schedule for April 6, 2018, to let people "calm down." During the call, Cmdr. Weyenberg also discussed whether Lt. Shaw was teaching the "standard," and that if Lt. Shaw "had different techniques for doing things in the aircraft, 'that was okay, after he [Lt. Shaw] finished the Instructor Under Training (IUT) syllabus."

22. Following the publication of the *Military.com* article, Lt. Shaw's command forced him to undergo a command directed assessment of his "mental state," a euphemism for a command

directed mental health evaluation convened for the purpose of giving the command reason to take further adverse administrative action against Lt. Shaw.

23. On April 11, 2018, an all-instructor meeting was held to discuss syllabus and instructional standardizations, and the process for IPs to submit change requests. This was the first time such information was disseminated in a public setting to the IPs, and based on the timing of the meeting in relation to the publication of *Military.com* article–of which the entire squadron had knowledge–it was apparent the meeting was convened to publicly debase Lt. Shaw.

24. The very next day, on April 12, 2018, per the guidance provided at the all-hands meeting, Lt. Shaw submitted four change requests to his chain of command and all VFA-106 IPs, one of which recommended introducing mechanisms into the syllabus that encouraged individuals to, or at least protected individuals who do, "speak up." Lieutenant Shaw's expressed concern when submitting the change requests was that "[t]he kind of ostracism and retaliation [he] received for reporting institutionalized illegal behavior [bottle bets], such as being recommended to a mental health evaluation, send[s] a very clear message that anyone who attempts to improve or change the organization for the better will be met with extreme negative and potentially career-ending consequences." Upon best information and belief, Lt. Col. Nesbitt forwarded his copy of the email to his personal email account. He also forwarded a copy of the email to Cmdr. Roberts to use as evidence in the CDI.

25. On April 25, 2018, one of the SPs, Lieutenant Junior Grade (Lt. j.g.) Ryan Rojeski, disqualified (DQ) during CQ due to an in-flight engagement caused by a late wave-off from the LSOs standing on the flight deck. Lieutenant Junior Grade Rojeski was required to attend a Performance Review Board (PRB)–which ended up being three, as the first two were deficient. During each one of the Boards, Lt. j.g. Rojeski was asked whether he had worked

with Lt. Shaw in preparation for the CQ, and was told he would be given a "free pass" if he

implicated Lt. Shaw in any wrongdoing. While Lt. j.g. Rojeski said he had worked with Lt.

Shaw in other phases of training, he did not receive any training from Lt. Shaw during CQ.

26. Despite the fact that flight data proved Lt. j.g. Rojeski's DQ was caused by a late wave-off

from squadron LSOs, and had nothing to do with Lt. Shaw, for the first time, Lt. Shaw was

directed not to work with the SPs on May 3, 2018.

27. The next day, May 4, 2018, Lt. Col. Nesbitt and Cmdr. Weyenberg met with a Staff Judge

Advocate (SJA) to receive guidance on potential courses of action against Lt. Shaw. During

this meeting, Lt. Shaw's command purposefully misrepresented certain facts, in order to

receive guidance that would fit their desired end state of having a CDI that was "conducted

via 'concrete legal means.'" They insinuated that Lt. Shaw was teaching "unauthorized CQ

techniques" to SPs which had resulted in mishap or injury, purposefully omitting the fact that

Lt. j.g. Rojeski, the one SP they were referring to, did not receive any such instruction from

Lt. Shaw.

28. Based on the misleading information, the SJA advised Lt. Shaw's command to issue Lt.

Shaw a letter of instruction (LOI) to serve as a formal counseling document to note any

deficiencies, and to see if Lt. Shaw's conduct improved. Alternatively, the SJA advised that

if the command felt the LOI would not be useful, then they could initiate a CDI with "a

neutral third party" to serve as the IO, and once the investigation was complete, the findings

could be reviewed to determine the next steps. The command elected to pursue the CDI

because they had "a lot of suspicions, but [not] a lot of evidence," and they wanted to "go in

and dig a little bit more." This same SJA was then ultimately used by the command as the

legal advisor in an attempt to make the CDI appear "neutral" in the event the CDI was appealed.

29. With the approval to convene a CDI from a "neutral" judge advocate, Lt. Shaw's command began drafting the appointing order. The proposed scope of the investigation covered the following alleged violations:

a. The dissemination of inappropriate information/techniques and use of non-standardized instructional methods to junior students and aircrew IRT [in relation to] landing on board USS Ship [CQ phase]. The scope of these techniques is not limited to only the CVN environment, but the VFA-106 F/A-18 FRS syllabus.

b. The misuse of VFA-106 share drive information, and deliberate use of false impressions IOT [in order to] embarrass instructor cadre, create false impressions to former VFA-106 students, and misrepresent facts IRT racial bias within the unit to the media IOT further personal objectives, undermining the chain of command.

c. The level, appropriateness and integration of the Complainant's relationship to junior students. Specifically, the use of his position as a future instructor, more experienced aviator and senior [Lt.] to further personal objectives, creating a non-graded evaluation system.

d. Failure to inform, utilize, and allow the chain of command to address and solve problems.

e. Not following orders when directed not to continue to instruct and interact with students.

f. The deliberate allowance of the expiration of his personal SWIM PHYS [Aviation Physiology Training and Aviation Water Survival Training Program qualifications] IOT prevent being involved in Strike training onboard NAS Fallon, [Nevada].

g. Allowing junior aircrew to be blamed, ridiculed and mistreated after deliberately filing an Inspector General Complaint.

30. After two days of collaboration and discussion on the scope, a CDI was appointed with Cmdr. Roberts–the former head of the LSO school, and thus a significant influence in the community which had been conducting the illegal bottle bets–to serve as the IO. The scope of the CDI changed drastically from the draft, and was reduced to the following:

> a. The dissemination of inappropriate information/techniques and use of non-standardized/reviewed instructional methods to junior students and aircrew IRT CAT-1 Carrier Qualification. The scope of your inquiry is not limited to only the CVN [carrier] environment, but also the VFA-106 F/A-18 FRS syllabus, and whether the instruction provided by [Lt. Shaw] comports with the Naval Air Training and Operating Procedures Standardization.

> b. The misuse of VFA-106 share drive information and sharing inappropriate information for unauthorized purposes.

> c. The level, appropriateness and integration of [Lt. Shaw's] relationship to junior students. Specifically, the use of his position as an instructor, more experienced aviator and senior lieutenant for inappropriate or unauthorized reasons, including, but not limited to, his contact with 17-4 student pilots and his alleged direct involvement in PRB discussions between a student and the PCO [prospective commanding officer].

31. Shortly after being appointed as the IO, Cmdr. Roberts sent an email stating that he was appointed as "the investigating officer into a [VFA-]106 IP [Lt. Shaw] who has been f*****g some s**t up in all our worlds," and that he was specifically appointed because "[t]hey need[ed] a bullet-proof O-5 willing to kamikaze this guy." He concluded his email stating that he was "looking forward to it in a very weird way."

32. Throughout the investigation, Cmdr. Roberts engaged in questionable "investigative techniques," to include:

> a. Shaping witness statements: In approximately 30 instances, Cmdr. Roberts sent witnesses and non-CDI personnel his *personally prepared* LSO recommendation document

with his perceived acceptable techniques for carrier landings, as well as witness statements from other CDI witnesses. He also provided the witnesses with proposed language for their statements which Cmdr. Roberts said would help him substantiate his findings and recommendations against Lt. Shaw.

      b. Creating bias against Lt. Shaw: In at least 20 instances, Cmdr. Roberts attempted to create witness bias against Lt. Shaw by disclosing Lt. Shaw's previous IG filings, and opining that Lt. Shaw would likely file more IG complaints in the future. Commander Roberts also requested multiple "offline" conversations with senior naval personnel in positions that could influence Lt. Shaw's career, and discouraged them from having Lt. Shaw join their squadrons.

      c. Exclusion of favorable or exculpatory evidence: Cmdr. Roberts purposefully excluded statements from the CDI witnesses who provided testimony in support of Lt. Shaw. One in particular informed Cmdr. Roberts that he had served with Lt. Shaw at his previous command, VFA-131, and that while there, Lt. Shaw, with the assistance of this individual who was also an LSO, had developed CQ training materials that were known within the command (thereby impacting Cmdr. Roberts' ability to argue that Lt. Shaw taught techniques unknown by the command or in violation of any order from VFA-131 not to instruct the material). After Cmdr. Roberts learned of this information, he declined to receive a written statement from the witness, stating "he had pretty much gotten everything he needed or wanted for his investigation at that point."

33. It was readily apparent that Cmdr. Roberts' sole purpose in conducting the CDI was to assist the command in justifying future actions. By May 24, 2018, well over a month before the investigation concluded, and after only speaking with five witnesses (two of whom were

provided draft statements by Cmdr. Roberts), Cmdr. Roberts sent an email to the command

stating he already had enough information to justify convening a FNAEB, which is a

subjective review board convened under MILPERSMAN 1610-020 to determine whether the

individual should be allowed to continue serving as a Naval Aviator.

34. On June 25, 2018, Naval Criminal Investigative Services (NCIS) was contacted by Cmdr.

Roberts to open an investigation on Lt. Shaw for allegedly recording videos in flight

simulators at VFA-106 and for sharing the videos (supposed classified information). This

was presumably based on Cmdr. Robert's interview of one of the CDI witnesses, Lt. Keedy,

who said Lt. Shaw showed him a video of what he (Lt. Keedy) believed was a flight

simulator. Despite Lt. Keedy stating that he saw *no* classified information in the videos,

Cmdr. Roberts sought an investigation into Lt. Shaw for mishandling classified information.

The NCIS agent was briefed on this information, and found insufficient evidence to initiate

an investigation–even with the low threshold burden of proof required for the initiation of an

investigation and the titling of a subject. On July 3, 2018, Lt. Col. Nesbitt, without sufficient

command authority and evidence to do so, then suspended Lt. Shaw's access to classified

information on the basis of the same unsubstantiated allegation. An incident report was also

placed in Lt. Shaw's Joint Personnel Adjudication System (JPAS) Account, triggering an

investigation by the DoD Consolidated Adjudication Facility (CAF) into whether Lt. Shaw

should be permitted to retain his security clearance, and ultimately a

recommendation/preliminary determination by DoD CAF to revoke Lt. Shaw's security

clearance.

35. On July 19, 2018, upon best information and belief, Cmdr. Roberts emailed a draft copy of

the CDI from his personal email account to another person stating, "Let the light at the end of

the tunnel be a train. May this attachment be that train." Commander Roberts recommended the command take criminal action against Lt. Shaw.

36. Following his review of the CDI, Cmdr. Brandon Scott (then-current VFA-106 CO), notified Lt. Shaw that he would be convening a Human Factors Board (HFB)–designed to assess personal issues negatively impacting flight performance, even though Lt. Shaw had shown no poor flight performance and had been prohibited from flying months earlier. The HFB convened on August 2, 2018. Three of the four members of the HFB were permitted to review the CDI prior to the HFB convening (a copy of which had not been provided to Lt. Shaw, despite his request).

37. Around the same time, Cmdr. Scott issued Lt. Shaw Temporary Assigned Duty (TAD) orders to the Air Operations Department at the base control tower. He was relegated to the corner of the Assistant Operations Officer's Office for approximately 1 month, after which he was moved to the lobby (where he remains to this day), essentially as a public display and warning to others on what consequences to expect should they also report wrongdoings.

38. On or about August 15, 2018, Lt. Shaw was notified that the DoD IG would be investigating potential whistleblower reprisal against him by Lt. Col. Nesbitt (VFA-106 XO), Cmdr. Weyenberg (former VFA-106 CO), Cmdr. Roberts (CDI IO), and Cmdr. Scott (then-current, now-former, VFA-106 CO).

39. On August 29, 2018, pursuant to Cmdr. Robert's recommendation for disciplinary action, Lt. Shaw was offered NJP under Article 15, UCMJ, alleging five specifications of Article 92 (Failure to obey order or regulation): (1) that Lt. Shaw failed to obey lawful orders issued at both VFA-131 and VFA-106 not to teach techniques detailed in the "F-18 Ball Flying Techniques" white paper; (2) that Lt. Shaw failed to obey an order not to use a recording

device inside a flight simulator by making a recording at some point between September 2016 and January 2018; (3) that Lt. Shaw failed to follow an order by Lt. Col. Nesbitt by having communication with Lt. j.g. Rojeski on divers occasions between May 3, 2018 and July 20, 2018; (4) that Lt. Shaw failed to obey an order by Lt. Col. Nesbitt not to enter the F/A-18 Flight Simulator Facility student ready room; and (5) that Lt. Shaw failed to obey an order from Lt. Col. Nesbitt not to instruct SPs in phases he was not qualified to teach.

40. Upon advice of military defense counsel, and knowing that the allegations were based on evidence derived from a faulty investigation (despite the fact he was *still* precluded from reviewing the CDI, and that other officers, outside the chain-of-command and without a "need to know"–to include officers in a *separate unit* in a *separate state*: VT-21, a unit in Kingsville, Texas–had been permitted to review, and/or were informed of the content of, the investigation) Lt. Shaw exercised his right to refuse NJP and demanded that the command try him on these alleged charges by trial at a court-martial. Following discussion with an SJA, Cmdr. Scott elected *not* to pursue court-martial charges. This is presumably because the SJA advised that the evidence gathered during the CDI was not only unreliable and tainted by unlawful whistleblower retaliation, but that there was insufficient evidence to sustain a conviction on *any* of the alleged charges.

41. Instead of pursuing criminal charges, which would be subject to judicial scrutiny and afford Lt. Shaw the right to have a detailed military defense counsel, Cmdr. Scott, by and through the direction and convening authority power of Rear Adm. Kelley, elected to convene a FNAEB, which is an administrative action solely under the discretion and direction of the chain of command, and at which Lt. Shaw is not afforded the right to counsel. The use of a FNAEB is almost exclusively reserved for instances resulting in damage to aircraft or gross

error while flying, and not the supposed violations committed by Lt. Shaw. He was notified on October 3 that the board was to be held on October 9, 2018 (despite having pre-approved leave for October 5 – 9, 2018). The same charges previously presented at NJP were used as the bases for the FNAEB.

42. The FNAEB was held over several days in October 2018–the length and delay of which was largely due to myriad procedural violations which caused multiple adjournments of the board. A bulk of the evidence presented by the command at the hearing was the retaliatory CDI. One of the main government witnesses presented at the FNAEB was Lt. Col. Nesbitt. He testified that he gave certain in-person orders to Lt. Shaw on dates that Lt. Shaw was not even physically present at VFA-106, but rather on leave. As an attempt to corroborate his testimony, the government provided a copy of, what was purported to be, Lt. Col. Nesbitt's personal diary that reflected certain dates he says he spoke with Lt. Shaw. The diary was directly sourced from Lt. Col. Nesbitt.

43. In the midst of the FNAEB, on or about October 11, 2018, Lt. Shaw was notified that his promotion to Lt. Cmdr. was being withheld.

44. The Senior Member of the FNAEB issued his final report on October 23, 2018, in which he recommended a Class B(1) classification, which would terminate Lt. Shaw's flight status while retaining his right to wear the insignia of a Naval Aviator.

45. On October 31, 2018, Lt. Shaw was provided a copy of the FNAEB report, along with a Report of Officer Misconduct which recommended that Lt. Shaw "show cause" for his retention in the Navy. Enclosed with the FNAEB report was a copy of Lt. Col. Nesbitt's journal.

46. On November 2, 2018, the CNAL SJA, Lt. Cmdr. Colberg, confirmed that the CDI was still considered "open," as it had not yet been approved or endorsed by the higher chain of command. This means all administrative and disciplinary action taken as a result of the CDI up to that point, to include the HFB, NJP, FNAEB, and Report of Officer Misconduct, were premature.

47. Lieutenant Shaw submitted a rebuttal to both the FNAEB report and Report of Officer Misconduct on November 14, 2018, with a request that Cmdr. Scott and Lt. Col. Nesbitt be recused from the decision making process as both individuals were under investigation by the DoD IG for whistleblower reprisal.

48. Despite the request for his recusal, Cmdr. Scott none the less endorsed both the Report of Officer Misconduct and the FNAEB Report, recommending that Lt. Shaw be "detached for cause," removed from the Fiscal Year 19 Lt. Cmdr. Promotion List, ordered to show cause for retention in the Navy, and that he receive a Class B(2) classification, which is termination of his flight status *and* revocation of his right to wear Naval Aviator wings–a more severe recommendation than the one provided by the FNAEB, and, upon best information and belief, possibly one of the most severe outcomes of all FNAEBs ever held in the Navy.

49. On November 19, 2018, a day *after* endorsing the FNAEB report, Cmdr. Scott endorsed the underlying retaliatory CDI, which had been pending his endorsement for three months.

50. Around the same time, Cmdr. Scott also "unfavorably" closed the incident report in JPAS, resulting in DoD CAF issuing a notice of proposed revocation of Lt. Shaw's security clearance nearly one year later, in October 2019.

51. On December 31, 2018, Lt. Shaw's Aviation Career Incentive Pay (ACIP), or "flight pay," was suspended in accordance with the FNAEB instruction governing Class B

recommendations. This resulted in Lt. Shaw being deprived of $650 in pay per month. In addition to the monthly pay cut, the suspension was backdated to October 23, 2018, the date of the FNAEB report, resulting in Lt. Shaw being indebted to the Navy for $801.67.

52. In January 2019, Cmdr. Scott also authored an adverse Fitness Report, documenting the alleged misconduct that had never been adjudicated.

53. Beginning in January 2019, there was constant coordination between Lt. Shaw's civilian attorney and Rear Adm. Kelley's office to meet with him regarding his endorsement of the FNAEB report. For nearly one year, Rear Adm. Kelley's office continuously delayed rendering a decision. This was, in part, due to the fact that the DoD IG investigation, which implicated many of the officers who had a hand in the FNAEB, was on going, as well as the on-going EO investigation initiated by Vice Adm. Miller.

54. In May 2019, Lt. Shaw was notified that he had not been selected for Aviation Department Head by the screening board–a necessary billet for any officer desiring to succeed in his or her Naval career.

**DoD IG Investigation: Substantiation of Whistleblower Reprisal.**

55. On June 12, 2019, the DoD IG informed Lt. Shaw that it had substantiated whistleblower reprisal against Lt. Shaw by Lt. Col. Nesbitt, Cmdr. Weyenberg, and Cmdr. Roberts. The DoD IG specifically found that the CDI had been initiated to "punish, harass, and ostracize" Lt. Shaw. The DoD IG recommended the Secretary of the Navy take appropriate action to remedy any harm to Lt. Shaw's career which resulted from the actions of these individuals.

56. As a result of these findings, on August 5, 2019, Lieutenant Colonel Nesbitt was relieved of his position as the XO of VFA-106.[2]

57. The very next day, August 6, 2019, Cmdr. Scott convened a "command climate" survey. From the concentration of comments focused solely on Lt. Shaw as well as the consistency of language within the various responses, it appears that those surveyed were instructed by the higher command to provide answers that were damning to Lt. Shaw. And, given the timing of this survey in close proximity to the Tailhook convention in September 2019, it appears that the survey was conducted as a means to garner "evidence" against Lt. Shaw and an attempt to subvert the DoD IG's findings.

58. The Tailhook Association Convention took place September 5-8, 2019. This convention is highly publicized and attended by many throughout the Naval fleet as well as retired Naval Aviators. Prior to a questions-and-answer panel conducted by several Flag Officers, to include Vice Adm. Miller and Rear Adm. Kelley, Vice Adm. Miller notified the panelists that there would be a question presented to the panel about an IG investigation and that Rear Adm. Kelley would be answering the question–in other words, a question was planted for specific purpose of being addressed by Rear Adm. Kelley. The question was posed by two IPs from VFA-106, Cmdr. Caponigro (VFA-106 Operations Officer who was serving as the XO following Lt. Col. Nesbitt's relief from command) and Lt. Cmdr. Scarbro (who also happened to have served as a member on Lt. Shaw's FNAEB); they asked the panel if the

---

[2] *See* https://www.navytimes.com/news/your-navy/2019/08/09/navy-fires-marine-xo-of-the-gladiators/ (last visited February 7, 2020). Lieutenant Colonel Nesbitt was then reinstated in September 2019; notwithstanding the Secretary of the Navy's affirmation of the DoD IG's finding of whistleblower retaliation, Lt. Col. Nesbitt continues to serve in this position and continues to instruct pilots. *See* https://www.navytimes.com/news/your-navy/2019/09/14/marines-clear-xo-fired-from-the-navys-gladiators/ (last visited February 7, 2020).

senior leadership in the Navy was doing anything to protect mid-level officers against junior officers who "weaponized" the IG against their bosses. Rear Admiral Kelley prefaced his response with, "That's a delicate question." He then stated that that the DoD IG is an "independent" organization, exclusive of the Navy "leadership" on the panel, and that unfortunately, the Navy cannot "change" the DoD IG's findings. The Navy leadership are concerned that someone "abused" the IG system (*i.e.*, Lt. Shaw), and that the Navy leadership are trying to see what preventions they can have the DoD IG put in place to ensure lower level individuals cannot abuse the IG system in the future. Rear Admiral Kelley concluded his remarks by stating that the Navy itself will have to make sure that any internal investigations it conducts (such as the CDI into alleged misconduct by Lt. Shaw) are perfectly "clean." In other words, it matters not the intent behind a CDI; it only matters that they ensure it is "appellate proof" so that any allegation which is initiated as whistleblower retaliation cannot be overturned.

59. On December 16, 2019, Mr. Gregory Slavonic, Assistant Secretary of the Navy (Manpower and Reserve Affairs), by and through the direction of the Secretary of the Navy, and upon review of the DoD IG findings, invalidated the CDI, and ordered the following to occur: (1) Correct and/or remove any adverse or derogatory material that resulted from the invalid CDI; (2) no later than December 18, 2019, advise the DoD CAF that the CDI (which formed the basis for the incident report in JPAS, suspension of Lt. Shaw's access to classified information, and the recommendation for revocation of Lt. Shaw's security clearance) had been invalidated; (3) Chief of Naval Personnel (CNP) must determine whether Lt. Shaw's professional or promotion opportunities may have been impacted as a result of reprisal, retaliation, and restriction and, if so, CNP is ordered to take remedial action; and (4) Cmdr.

Weyenberg and Lt. Col. Nesbitt are to be subjected to a retirement grade determination (RGD), which will be adjudicated by Mr. Slavonic. All corrective action was ordered to be completed by February 14, 2020.

60. In the same correspondence, the Assistant Secretary authorized the convening of a second CDI into similar bases as the first CDI. This disposition was approved by the Secretary of the Navy in correspondence to Representative Elaine G. Luria of January 10, 2020. An appeal of this disposition is pending.

## **Continued Retaliation and Defamation.**

61. On January 16, 2020, Lt. Col. Nesbitt, Cmdr. Roberts, and Cmdr. Weyenberg, by and through their counsel, Mr. Timothy C. Parlatore, filed a retaliatory complaint with the DoD IG alleging that the DoD IG investigator who substantiated the whistleblower retaliation by these three individuals against Lt. Shaw was biased. In this DoD IG complaint, Lt. Col. Nesbitt, Cmdr. Roberts, and Cmdr. Weyenberg alleged numerous false allegations of criminal misconduct by Lt. Shaw in an attempt to defame Lt. Shaw. One allegation in particular was that Lt. Shaw had come into possession of Lt. Col. Nesbitt's notebook (which was introduced by Lt. Col. Nesbitt at the FNAEB, and included as an enclosure to the final FNAEB report, of which the command was required to provide to Lt. Shaw) by "unlawfully search[ing] [Lt. Col.] Nesbitt's office to make copies for himself." Lt. Col. Nesbitt knew this to be a false statement, as he himself provided the copy of the notebook (which he fabricated for purposes of attempting to corroborate his false testimony) at the FNAEB. Such an allegation, especially a false one, was made for no other purpose than to defame Lt. Shaw.

62. Attached to this complaint was an unredacted copy of the "command" climate survey conducted between August 6, 2019 and August 21, 2019. Upon best information and belief,

Mr. Parlatore obtained the survey, which was replete with reference to Lt. Shaw, from one of his three clients: Lt. Col. Nesbitt, Cmdr. Weyenberg, or Cmdr. Roberts.

63. Mr. Parlatore has been distributing this IG complaint with the appendices to various non-governmental organizations as well as various United States congressional offices.

64. In addition to the recent DoD IG complaint, Mr. Parlatore has been submitting additional correspondence requesting various congressional members overturn the decision of ASN (M&RA). Enclosed with this correspondence, which has since been distributed throughout the Naval Aviation community, was a copy of the original CDI conducted by Cmdr. Roberts. In this correspondence, Mr. Parlatore alleged that Lt. Shaw had committed theft of intellectual property by obtaining a patent for "Operator training and maneuver refinement system for powered aircraft," which Mr. Parlatore falsely claimed "contain[ed] a description that looks suspiciously familiar to a description of the F/A-18 Flight Control System" that is made by Boeing.

65. Since the inception of the original CDI, and in addition to the various adverse personnel and administrative actions he has suffered (despite those adverse actions having been ordered to be set aside), Lt. Shaw has been ostracized, treated like a criminal, and precluded from flying. He suffered grave reputational harm; given the small environment that is the active, retired, and former Naval aviation community, this reputational harm will continue to plague him even after he is able to leave the Navy. He has also been placed on legal hold, which has precluded him voluntarily leaving the Navy, despite the expiration of his service obligation. Not only is he now being held past his end of obligation, but he is being precluded from resigning his commission – the only thing that would allow him some escape from this now-never-ending, vicious cycle of retaliation.

66. Following the commencement of this action, Defendant Parlatore informed Lt. Shaw that he has a copy of the FNAEB documents.

## FIRST CAUSE OF ACTION
### (Privacy Act)

### The DON's release of certain documents was in violation of the Privacy Act, 5 U.S.C. § 552a.

67. The Privacy Act prohibits disclosure of any record contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

68. The command climate survey conducted in August 2019 was a record maintained by the DON, in which Lt. Shaw is explicitly named myriad times.

69. The record, in its entirety, without Lt. Shaw's name being withheld, and without the consent of Lt. Shaw, was intentionally provided to Defendant Mr. Parlatore.

70. The original CDI conducted by Cmdr. Roberts was a record maintained by the DON, in which Lt. Shaw is explicitly named (and investigated).

71. The record, in its entirety, without Lt. Shaw's name being withheld, and without the consent of Lt. Shaw, was intentionally provided to Defendant Mr. Parlatore.

72. The FNAEB report into Lt. Shaw, including all appendages, was a record maintained by the DON.

73. The record, in its entirety, without the consent of Lt. Shaw, was intentionally provided to Defendant Mr. Parlatore.

74. Lieutenant Shaw has suffered actual pecuniary harm as a result of these disclosures.

75. Accordingly, the DON is liable for all actual and statutory damages, attorney's fees, and

costs.

## SECOND CAUSE OF ACTION
### (Libel *per se*)

### Defendant Mr. Parlatore has Committed Libel *Per Se*.

76. Any written or printed statement which falsely charges another with the commission of a

crime is libelous *per se*.

77. In the filing of the IG complaint on behalf of his three clients (Lt. Col. Nesbitt, Cmdr.

Roberts, and Cmdr. Weyenberg), Mr. Parlatore inferred that Lt. Shaw had unlawfully

trespassed on either government or private property in order to obtain a copy of Lt. Col.

Nesbitt's notebook–the very same one produced by Lt. Col. Nesbitt at Lt. Shaw's FNAEB.

Specifically, Mr. Parlatore asserted: "It is unknown how LT Shaw came to possess a copy of

LtCol Nesbitt's notebook in the first place. It appears that he either unlawfully searched

LtCol Nesbitt's office to make copies for himself or received copies from [the DoD IG]..

Either possibility is a very serious and deeply concerning issue."

78. Mr. Parlatore knows this to be false, and yet he provided the false statement, inferring that Lt.

Shaw had committed a "very serious" crime. Mr. Parlatore then distributed the IG complaint

to several third party individuals, without a need to know, such as various Congressional

staffers and Non-Governmental Agencies.

79. In his recent correspondence, submitted to U.S. Representative Elaine Luria, Mr. Parlatore

alleged that Lt. Shaw had committed theft of intellectual property when he filed for a patent

that had, according to Mr. Parlatore, a description similar to the F/A-18 Flight Control

System – thereby committing theft of intellectual property from Boeing. This is false, and

Mr. Parlatore knows it to be false.

80. In publishing these statements about Lt. Shaw, Mr. Parlatore has committed libel *per se*. He

is liable to Lt. Shaw for all statutory damages, attorney's fees, and costs.

## **RELIEF**

Wherefore, Lt. Shaw prays that this Honorable Court conduct a speedy hearing and direct the

following relief:

1. That Lt. Shaw be awarded full compensation for all damages incurred, to include

   presumed damages;

2. That Lt. Shaw be awarded the costs and reasonable attorney's fees incurred in

   bringing this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412

   and the Privacy Act, 5 U.S.C. § 552a; and

3. Such other relief as may be deemed necessary or appropriate in order to accord full

   and complete relief.

4. Lieutenant Shaw demands a jury trial on all causes of action permitted to be tried

   before a jury.

Respectfully submitted,

                                    */s/ Eric. S. Monatlvo*
Eric S. Montalvo, DC Bar No. 993206
THE FEDERAL PRACTICE GROUP
1750 K Street N.W., Suite 900
Washington, D.C.  20006
Telephone:     (202)862-4360
Facsimile:      (888)899-6053
emontalvo@fedpractice.com

Dated: March 26, 2020                        Attorney for Plaintiff