UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------------------------X
STEVEN SHAW,

                   Plaintiff,                      Docket No.: 20-cv-410

     -against-

THE HONORABLE CARLOS DEL TORO, and
TIMOTHY C. PARLATORE, ESQ.

                 Defendants.
-----------------------------------------------------------------------X

## DEFENDANT PARLATORE'S MOTION FOR SANCTIONS AGAINST PLAINTIFF AND HIS COUNSEL

Defendant Timothy C. Parlatore, *pro se*, moves, pursuant to Fed.R.Civ.P. 11 for this Court to impose sanctions against Plaintiff and his counsel for frivolous conduct in the filing, maintenance and litigation of this action. Pursuant to the safe harbor provisions of Fed.R.Civ.P. 11(c)(2), a copy of this motion was served on Eric Montalvo, counsel for the Plaintiff, on September 2, 2022. Pursuant to DC LCvR 7(m), the parties attempted to confer to resolve this motion, but without success. The last day for Plaintiff to withdraw this lawsuit against Defendant Parlatore was September 23, 2022 and, failing to do so, the motion is now ripe for filing.

### PRELIMINARY STATEMENT

The case at bar is nothing more than a publicity stunt and frivolous abuse of the judicial system by a disgraced former Naval Aviator and his dishonest, unethical counsel.[1] This case has been fatally flawed, both legally and factually, from its inception, as Plaintiff's counsel began the very first appearance in this matter by lying to the Court.

---

[1] While I would not normally use such strong language to describe an opposing counsel in court documents, Mr. Montalvo did commence this case by standing in the courtroom and lying to the Court about events he claimed to have participated in, but were quickly disproven through transcripts.

1

From this despicable beginning, the case has devolved into repeated amendments in an effort to cobble together a coherent complaint, while abusing the discovery process in an attempt to improperly pierce the attorney-client privilege and to harass good and honorable officers who dared to hold Plaintiff accountable for his misconduct.

At its core, this case is about a former Naval Officer who disgraced himself and put numerous lives at risk, while retaliating against anyone who threatened his continued dangerous and unlawful behavior.  Plaintiff's misconduct is well known and resulted in self-inflicted alienation from substantially the entire Naval Aviation community.  It is indisputable that Plaintiff secretly taught unapproved and potentially deadly carrier landing techniques to impressionable young student pilots.  Plaintiff displayed open contempt for his fellow aviators as he gave several unauthorized media interviews to denigrate his shipmates and even created a profoundly disturbing shoulder patch depicting the murder of the squadron mascot:



In an effort to insulate himself from any accountability, Plaintiff weaponized the Inspector General process through filing repeated complaints in retaliation against any officers who impeded his use of unlawful and potentially fatal activities.  As collateral damage of his unlawful campaign, Plaintiff wrongfully destroyed the careers of four very

well respected senior Naval Aviators, two of whom had screened for promotion to Captain and Command of an Air Wing.

In an effort to protect themselves from further charges and assist them in successfully protecting their retirement pensions, these four officers hired Defendant Parlatore, a well-known attorney with a track record for protecting his clients against overreach by the Navy.  Defendant quickly set about vigorously defending his clients which, necessarily, required exposing Plaintiff for his pattern of illegal conduct and persistent dishonesty.  As this defense threatened Plaintiff's ability to continue illegally manipulating the system, Plaintiff and his attorneys chose to pursue a completely frivolous lawsuit against Defendant.

From the initial filing of this matter, Plaintiff filed an emergency motion for a facially unconstitutional restraining order, asking this Court to prospectively restrict Defendant's speech and ability to advocate on behalf of his clients.  Moreover, at the initial appearance, Eric Montalvo, counsel for Plaintiff began by telling this Court a completely made-up story about a prior administrative hearing where Mr. Montalvo claims that he cross-examined one of Defendant's clients.  This story was a knowing and intentional fabrication.

The complaint in this action has undergone numerous revisions because of Plaintiff's inability to conduct basic legal research.  First, he had to withdraw an obviously flawed Privacy Act claim that he had improperly raised against Defendant Parlatore, despite the unequivocal fact that Privacy Act claims can only be raised against governmental agencies, not individual defendants, and certainly not private non-government employees.  Then he had to withdraw an obviously flawed libel claim related to Plaintiff's filing of a patent application because Defendant's statement was indisputably

true that Plaintiff violated the provisions of 37 C.F.R. 501, as required for all government employees. There were also several amendments to the counts against the Navy, which barely squeaked by on the fourth attempt, albeit in what the Court described as a "close question" for a complaint described as "less than pellucid."

At this point, the only remaining cause of action is a single, obviously flawed libel cause of action. This cause of action is clearly unwarranted by the law, in that it fails to identify any defamatory statements, but rather cites to a question that was posed. Moreover, the alleged defamatory question is a single sentence in a footnote on a minor collateral issue in a 10-page letter that outlines significant, dangerous, and criminal misconduct by Plaintiff. The theory that, after reading ten pages of uncontested, truthful, and derogatory information about Plaintiff, any reader's opinion of Plaintiff would be negatively affected by a question posed in a footnote defies all common sense. No reasonable, competent attorney could deem this a legitimate claim to raise.

Predictably, since the case proceeded to discovery, the full scope of Plaintiff's improper intent was quickly revealed, as he made discovery demands for privileged and confidential communications between Defendant and his clients, while obstructing the relevant discovery demands from Defendant before finally submitting obviously perjurious responses.

Perhaps most outrageous is the discovery produced regarding damages. The initial complaint that was filed named several Admirals as co-defendants and ridiculously alleged some form of vast racist conspiracy. Plaintiff peddled these preposterous claims to the media[2] in the hopes that the claims of racism would garner some public support.

---

[2]     https://www.navytimes.com/news/your-navy/2020/02/14/whos-who-of-navy-aviators-sued-by-lieutenant-claiming-vast-racist-conspiracy/

However, the discovery produced has revealed that this plan backfired, since much of the negative social media comments Plaintiff claims as threats are actually in response to the news articles about this case, rather than any alleged Privacy Act violations or defamation.

Much of the improper actions taken by Plaintiff and his counsel have little to no case law to compare it to, because before this case, it was inconceivable that any licensed attorney would engage in such blatantly frivolous behavior.

## STATEMENT OF FACTS

### Background

Plaintiff was a young, relatively inexperienced, F/A-18 pilot with a demonstrated reputation for retaliating against senior Navy leadership that disagreed with him, and then using the media in an attempt to publicly undermine his superior officers while falsely painting himself as the hero that the Navy should be listening to. This pattern began around the time that he graduated from the U.S. Naval Academy and penned a column for the Capital Gazette, complaining that the Naval Academy had failed to rewrite their Honor system in the way that Plaintiff wanted them to.[3]

LT Shaw went on to flight training and ultimately, after qualifying to fly the F/A-18C Hornet, LT Shaw was assigned to VFA-131. Despite his limited experience, he decided to write a white paper called "Ball Flying for F-18 Pilots," where he espoused a completely untested, unauthorized, and dangerous method of using an instrument called the Velocity Vector Indicator as a primary tool for lining up an approach to land on an aircraft carrier. However, rather than submitting his white paper to Naval Air Systems Command to test

---

[3]    https://archive.is/20140201064011/http://www.capitalgazette.com/news/guest-column-naval-academy-honor-concept-strays-from-roots/article_f3b4151b-da04-5df1-a047-f3e1ef525d85.html

and evaluate, he instead began sharing this document with other junior aviators who began testing his theories with near catastrophic results.

After several scary wave-offs and one near ramp strike, the Landing Signals Officers ("LSO")[4] and leadership discovered that these junior aviators were dabbling in LT Shaw's theory, rather than following the prescribed method of carrier landings.  On August 22, 2016, the air wing LSO sent a message to the LSO School to report on LT Shaw's activities and the potentially deadly consequences:

> We crushed a Hornet JO - he wrote a 9 page manifesto on velocity vector gouge and ball flying.  We had just found out about it, but we quickly found out it was circling amongst some of the Airwing JOs. Boxxx has a video of a pass from a JO in that squadron, apparently under the tutelage of the manifesto-writer, that we will get to you. Not sure how Boxxx kept him off the ramp - truly scary vision.  Don't worry, the last page of the manifesto was an appendix that calculated the angle an aircraft would have to maintain to fly straight into the round down from the start (no, I'm not joking). This may be the only accurate section in the entire document - but I'm not going to test it out for you.

One week later, LT Shaw was detached from VFA-131 and sent home for medical treatment after injuring himself during an alcohol fueled port visit.  However, the LSO leadership took action to ensure that all LSOs were on the lookout to ensure that no other aviators were following LT Shaw's landing technique.  Although they kept his identity

---

[4] The landing signal officer's primary responsibility is the safe and expeditious recovery of fixed-wing aircraft aboard ship. The employment of high-performance aircraft and the necessity for all weather operations have placed ever increasing demands on the LSO's skill and judgment. Through training and experience, he is capable of correlating

factors of wind, weather, aircraft capabilities, ship configuration, pilot experience, etc., in order to provide optimum control and assistance in aircraft landings. The LSO is also directly responsible for training pilots in carrier landing techniques. In this regard, he must constantly monitor pilot performance, schedule and conduct necessary ground training, counsel and debrief individual pilots, and certify their carrier readiness and qualification. The pilot and LSO form a professional and disciplined team, both ashore and afloat. The LSO strives to develop the pilot's confidence, judgment, maximum effort, technical proficiency, and personal interest. The pilot must rely on the LSO's experience

and ability to prepare him for optimum effectiveness as a carrier pilot.

anonymous, the incident was reported in the September 2016 LSO newsletter, which was transmitted to all LSOs fleet wide.

LT Shaw was next assigned as an instructor pilot at VFA-106, the fleet replacement squadron that trains new aviators how to fly the F/A-18E/F Super Hornet.  He missed the first several months to recover from his knee injury, but once he returned to full duty, he made little to no effort to get his required qualifications to serve as an Instructor Pilot ("IP").  Instead, he focused his efforts on finding complaints that he could file against the squadron, while secretly teaching students the same prohibited carrier landing techniques that had nearly killed his squadron mate at VFA-131.

### The Complaints

LT Shaw sought out opportunities to file complaints against his command.  He searched the list of students who had failed to qualify and reached out to the only two African Americans on the list with an enticing offer, he would assist them with filing complaints alleging racism against the squadron and potentially give them another shot at their dreams of becoming fighter pilots.  Although he was never a flight instructor for either student (and one had left the squadron well before LT Shaw arrived), he helped them weave a tale of racism that was completely unsupported by the evidence and unsupported by any of the African American instructors at the squadron.  When his complaints failed to achieve the desired results, LT Shaw took these false claims to both Senator Warner's office and the media.  Although he successfully got a profile in military.com about the alleged racism at VFA-106, and his own fake prowess as an instructor, the investigations failed to produce any evidence of bias resulting in these students' failures to perform.  After the article was released, at least one of those students admitted that he knew he was disenrolled because he had difficulty keeping up with his

peers, not because of any racism.  After an investigation, it was determined that these two students were disenrolled because of sustained substandard performance and were unable to complete the fighter syllabus successfully.  However, some of the instructors failed to treat the students with proper dignity and respect.  Changes were immediately implemented to ensure that no such problems would occur in the future.

Similarly, LT Shaw looked for a complaint to file for the purpose of targeting the LSOs, who had crushed his dangerous carrier landing technique.  He seized on a longstanding and voluntary tradition of "bottle bets," whereby students could make friendly bets with their LSO instructors on whether they would pass their qualifications. LT Shaw manufactured claims that he had been approached by several students to complain and that he had attempted to discuss the matter with several instructors to correct it, but without avail.  Both the claims of racism and bottle bets are false, as LT Shaw acted alone and made no efforts to give the command the opportunity to correct any improprieties.  Although he had the option to remain anonymous, LT Shaw elected to become the named complainant.

Unfortunately for LT Shaw, the Inspector General found "that the allegation involves a command matter for which ISIC oversight and resolution, rather than IG inquiry, is appropriate."  Thereafter, the command took positive actions to ensure that the traditional practice was reigned in and made clear that it was an optional exercise, thus ensuring that it was conducted legally and ethically.  LT Shaw refused to accept that his efforts to attack the LSO community[5] had failed to produce the retaliatory results he

---

[5] It is important to understand that carrier landing training is a matter that LT Shaw had absolutely no involvement with.  As he never tried to become an LSO, he is ineligible from even becoming qualified to teach carrier landings.  He therefore was not involved in any of the carrier landing training or execution and was not present or involved in any of the bottle bet activities.

sought, so he brought the matter to Senator Warner's office to escalate an already resolved matter. Eventually, Commander of Naval Air Forces put out a message to cease all bottle bets. Thereafter, LT Shaw revealed himself to the command as the complainant.

LT Shaw pushed these complaints for the sole purpose of attacking the command and particularly the LSOs, while ensuring that everyone knew that he was behind them so that he could use whistleblower protection status to immunize himself from any accountability.

### LT Shaw's Dangerous Misconduct

Throughout his tour at VFA-106, LT Shaw made little effort to get qualified to teach any phase of instruction. Rather than spending time getting qualified to teach the approved syllabus, he devoted his efforts to creating an entirely new syllabus, spending hundreds of hours drafting papers, exercises, presentations, videos, and drawings. Many of the techniques included in his syllabus are unproven, overly simplistic, or downright dangerous ways to fly the Super Hornet. The centerpiece of his unauthorized curriculum is, of course, the dangerous carrier landing techniques that had almost killed his shipmate at VFA-131. However, rather than submit this syllabus through the proper channels of the Navy for review and potential approval to be used as part of the official syllabus, LT Shaw concealed these lessons from all the qualified instructors and aviators. Instead, he secretly provided it to the impressionable and inexperienced students.

In addition to providing unauthorized and dangerous training to students, while he, himself was unqualified to work as an instructor, LT Shaw began sneaking a camera into the simulator building to film himself performing experimental maneuvers in the simulator. This is highly illegal, as the simulator building is a secure facility that houses classified materials.

### Accountability vs. Retaliation

When squadron leadership stepped in to try to hold LT Shaw accountable and ensure that his actions did not result in student deaths, LT Shaw filed several more Inspector General Complaints claiming retaliation. By a quirk of fate, the case was assigned to David Ursini, a disgruntled former Naval Flight Officer and inept investigator who conducted an extraordinarily incompetent investigation. Despite a complete lack of evidence supporting LT Shaw's claims and a mountain of exculpatory material, Mr. Ursini wrote a report concluding that LT Shaw had been retaliated against by his squadron leadership.

As discussed more fully in the complaint filed against Mr. Ursini, which was included as Exhibit 3 to Plaintiff's Motion for a Preliminary Injunction, this report failed to properly address the issue of causation. It is undisputed that LT Shaw made protected communications and it is undisputed that there were adverse personnel actions taken against him. There is no evidence that these two situations are linked, as the adverse personnel actions were all required based on squadron leadership's obligation to ensure safety of flight and to address misconduct by LT Shaw which was unrelated to his protected communications. Therefore, the actions taken by squadron leadership against LT Shaw for his dangerous misconduct were authorized and lawful, pursuant to subparagraph (b)(2)(C) to 10 USC § 1034:

> Nothing in this paragraph shall be construed to limit the ability of a commander to consult with a superior in the chain of command, an inspector general, or a judge advocate general on the disposition of a complaint against a member of the armed forces for an allegation of collateral misconduct or for a matter unrelated to a protected communication. Such consultation shall provide an affirmative defense against an allegation that a member requested, directed, initiated, or conducted a retaliatory investigation under this section.

At this point, the squadron leadership hired civilian attorney, Defendant Timothy Parlatore, to represent them.  A rebuttal submission was prepared that eviscerated Mr. Ursini's report, leading the Marine Corps to file a Report of No Misconduct against the Executive Officer of VFA-106, LtCol Nesbitt.  The original squadron commander, CDR Weyenberg was given a Non-Punitive Letter of Caution, while the commander who replaced him, CDR Scott was completely exonerated.

## Agency Action

 Undeterred, LT Shaw pushed his case to Congress, where he intentionally deceived Congresswoman Elaine Luria to write to the Secretary of the Navy demanding that LT Shaw be put back on flight status.  He also intentionally deceived other elected officials and non-profit, Project on Government Oversight ("POGO") to advocate on his behalf.

Ultimately, under the political pressure that LT Shaw had brought to bear, the Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN M&RA") issued an order blindly accepting the obviously deeply flawed findings of Mr. Ursini, without making any effort to hear the other side of the story.  He ordered that LT Shaw's service record be sanitized of all adverse effects of his misconduct and that the squadron leadership be evaluated for whether their retirement should be reduced as a result.  ASN M&RA gave LT Shaw everything that he wanted, except for one thing.  He set parameters to limit the scope of any re-investigation of LT Shaw, while LT Shaw wanted him to prohibit the Navy from ever investigating him or holding him accountable for placing lives at risk and potentially compromising classified materials.

### LT Shaw Files a Frivolous Lawsuit

In a desperate effort to delay or avoid the investigation into his own misconduct, LT Shaw has filed the instant lawsuit.  His initial complaint contains numerous material misstatements of fact and incomprehensible legal claims.

One of the most offensive and malicious aspects of the complaint is LT Shaw's opportunistic claims of a racist conspiracy.  Cognizant of the stigma and potential publicity that attaches to one who is branded a racist, LT Shaw intentionally and falsely presents the complaint as a tale of racism in VFA-106 and in Naval Aviation.  While there is room for improvement in certain areas, the tale of racism told by LT Shaw is wholly invented.  In fact, the investigations revealed that none of the African American instructors concurred with LT Shaw's claims about racism at VFA-106.

These outrageously false claims were made as part of LT Shaw and his attorney's despicable efforts to use this lawsuit as a publicity stunt.  LT Shaw attempted to have this case reported in the media and even brought a publicist with him to Court at the initial appearance on the preliminary injunction.  After the Navy Times did report on the case, Plaintiff's counsel posted the article on his firm's website and promoted the article on social media with the hashtag #racism.

In an effort to silence the opposition, LT Shaw also sued the civilian attorney representing his squadron leadership on an inept libel theory, while moving for a preliminary injunction seeking a prior restraint on both the attorney's First Amendment rights, as well as to prevent him from advocating on his clients' behalf.

During the oral arguments on this preliminary injunction, LT Shaw's attorney, Eric Montalvo, made several material misrepresentations to the Court.  For example, Mr. Montalvo told the Court a story about how he had cross-examined LtCol Nesbitt at a prior

administrative hearing when, in fact, there was no such cross-examination.  He also falsely claimed that LT Shaw had received a Navy Achievement Medal for teaching his dangerous carrier landing technique when the citation clearly shows this to also be untrue.

What makes this case particularly offensive is LT Shaw's decision to take advantage of two African American former student pilots in an effort to paint a false picture of racism in the Navy.  LT Shaw specifically sought out to these two individuals (one of whom had already left before LT Shaw arrived at VFA-106) to encourage them to file EO complaints on the promise that it could help them get back into training.  LT Shaw pushed them into media interviews, all with the goal of falsely portraying the squadron as racist and himself as a master instructor (while concealing the fact that he failed to qualify to instruct even a single phase).  Both of their EO complaints were unfounded because race played no role in their disenrollment, yet LT Shaw is continuing to appropriate their debunked stories to protect himself.  Now, by filing this frivolous complaint and pushing a false racism narrative in the media, he has attempted to again drag these two officers into a public spotlight for his personal benefit.

## LEGAL STANDARD

Fed.R.Civ.P. 11 provides that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

## ARGUMENT

### I.   The Claims Against Defendant Parlatore are Being Presented for an Improper Purpose

This entire lawsuit is nothing more than a publicity stunt and frivolous abuse of the judicial system for the purpose of prolonging the inevitable.  LT Shaw did not show up to the courthouse with a team of lawyers, but rather a lawyer and a publicist. Immediately following the appearance, his attorney (presumably with the assistance of his publicist) posted an article about the proceeding on his website and social media.  This pattern of behavior follows LT Shaw's pattern of attempting to put himself into the media spotlight while using that spotlight to falsely bash his shipmates.

Discovery has similarly demonstrated the completely improper purpose of Plaintiff's litigation strategy, as he has demanded obviously privileged and confidential information from Defendant, while providing almost nothing in return.  He aggressively demands to schedule depositions of Defendants while ignoring all attempts to discuss

availability of Plaintiff to be deposed.  Now, he is issuing subpoenas to depose officers who held him accountable while on active duty, but who possess no non-privileged, admissible information relevant to the claims Plaintiff is asserting here.

Moreover, as discussed in the next section, Plaintiff's claim against Defendant Parlatore is wholly unwarranted under existing law – a fact that has been clearly communicated to Plaintiff and his counsel in the past, yet he persists in maintaining this completely frivolous cause of action.

Separately, while not asserted against Defendant Parlatore, Plaintiff's Privacy Act claims against the Navy are also knowingly frivolous.  The documents that Plaintiff complains were transmitted to Defendant Parlatore were provided as part of discovery in the course of representing his clients.  Plaintiff's counsel, as a former JAG lawyer with the Marine Corps, is fully aware that the military is required to provide discovery to defense counsel in such cases and presumably even received similar documents from the Navy in his representation of LT Shaw.  Now that discovery has progressed, Plaintiff has documentary proof that these documents were lawfully provided, yet he persists in maintaining this knowingly baseless case.  Although this cause of action is not asserted against Defendant Parlatore, Plaintiff's frivolous conduct is emblematic of his larger misconduct in this case and is the basis for his abuse of the discovery process, for the purpose of harassing Defendant Parlatore and his clients.

## II.    The Libel Claim is Unwarranted Under the Law and Completely Frivolous

In asserting libel claims against Defendant Parlatore, Plaintiff utterly failed to properly consider both the factual and legal basis of these claims.  As an introductory matter, LT Shaw is a limited-purpose public figure based on his voluntary participation

in various news article and interviews and, as such, is required to meet the heightened standard of actual malice.  However, under any standard, this cause of action fails, as the sole remaining allegedly libelous statement is invalid on its face:

> Mr. Parlatore inferred that Lt. Shaw had unlawfully trespassed on either government or private property in order to obtain a copy of Lt. Col. Nesbitt's notebook-the very same one produced by Lt. Col. Nesbitt at Lt. Shaw's FNAEB. Specifically, Mr. Parlatore asserted: "It is unknown how LT Shaw came to possess a copy of LtCol Nesbitt's notebook in the first place. It appears that he either unlawfully searched LtCol Nesbitt's office to make copies for himself or received copies from [the DoD IG] .. Either possibility is a very serious and deeply concerning issue."

*Complaint* ¶111.

A plain reading of this quote, in context, demonstrates that Defendant was asking the DoD IG to investigate whether David Ursini had improperly given documents to LT Shaw that he had obtained during his investigation, or if there was another explanation that would exonerate Mr. Ursini, such as LT Shaw taking a copy from LtCol Nesbitt's office.  "A statement challenged as defamatory, regardless of whether it is posed as a question, cannot be libelous unless it can reasonably be read as a false assertion of fact." *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 15 (D.D.C. 2013), *citing Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993). ("[I]nquiry itself, however embarrassing or unpleasant to the subject, is not accusation.").[6]

---

[6] These issues could have been raised in a Motion to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), however Defendant chose not to do so in favor of first putting Plaintiff through the paces of discovery.  As Plaintiff's criminal conduct and persistent false statements have severely damaged Defendant's clients, some of whom were still facing disciplinary actions as a result of Plaintiff's misconduct at the time, Defendant put the best interests of his clients above his own to use the discovery mechanisms to which Plaintiff had foolishly exposed himself to in order to exonerate his clients.  However, these arguments could still be raised at any time in either a Fed.R.Civ.P. 12(c) motion or a Fed.R.Civ.P. 56 motion.

On its face, the only factual assertion here is that "[i]t is unknown how LT Shaw came to possess a copy of LtCol Nesbitt's notebook in the first place," not an affirmative statement that he had taken it from LtCol Nesbitt's office.  This type of statement cannot legally be considered defamatory.

However, even under this patently deficient interpretation, it is impossible for LT Shaw to have suffered any damage from this statement because his reputation is libel-proof.  "Libel-proof plaintiffs are those whose reputation is so besmirched, either from uncontested portions of the allegedly libelous publication or from other events occurring prior to the challenged publication, that as a matter of law such plaintiffs would be unable to recover for further damage to reputation." *Liberty Lobby, Inc. v. Anderson*, 562 F. Supp. 201, 209 n.12 (D.D.C. 1983), *citing Simmons Ford, Inc. v. Consumers Union of the United States, Inc.*, 516 F. Supp. 742 (S.D.N.Y.1981).

Here, it is uncontested that LT Shaw engaged in a host of unsavory behavior.  Among many other things, he surreptitiously recorded conversations with his superior officers, including those he has not yet met, such as CDR Scott.  He collected screenshots of group chats that he was not a participant in.  Through his behavior, he had already soiled his own reputation so badly that any allegation of copying LtCol Nesbitt's notebook would be superfluous.

## III.   Mr. Montalvo Made Material Misrepresentations to the Court in the Initial Appearance

On February 13, 2020, when the parties appeared before the Court, there was limited oral argument, yet the arguments that Mr. Montalvo advanced contained knowing, material misstatements of fact.  First, he stated:

> So what all this means is that the executive officer, during 2018, came in to testify. I cross-examined him on that testimony. He then said

> he had notes that reflected the situation. He then -- it was
> demonstrated that the notes that he said that were taken
> contemporaneous could not have been accurate because the dates
> that he was providing, Lieutenant Shaw was either on leave or not
> even in the command. And so the investigation ultimately
> determined -- and we have this and will supplement the record -- that
> their testimony of both the commanding officer and the executive
> officer was incredible or not reliable.

Mr. Montalvo was fully aware that this statement was entirely false, yet he chose to fabricate a cross-examination that he then told the Court. The reality is that he never cross-examined LtCol Nesbitt, as COMNAVAIRFORINST 5420.1H states:

> The FNAEB respondent has no right to be represented by a military
> lawyer before the board. The respondent may bring a lawyer or
> non-lawyer advisor and may confer with the advisor during the
> course of the hearing. The respondent's advisor may testify before
> the board, just as any other witness; however, the advisor may not
> take an active part in the hearing. Specifically, an advisor may not:
> a. challenge board members, b. question board members or
> witnesses, and c. make objections, arguments or opening and
> closing statements.

Later, Defendant provided Mr. Montalvo with the opportunity to correct the record, as required by R.P.C. 3.3(a)(1) or to "supplement the record," as he had promised during that Court appearance, but Mr. Montalvo instead flippantly responded, "In the words of the pirate Barbossa, 'I'm disinclined to acquiesce to your request.' Have a good day."

Later in that same hearing, Mr. Montalvo falsely stated:

> What Mr. Parlatore continues to do is either he's misinformed or
> he's not well researched, because when he's saying these training
> techniques and things, as we will supplement in the record, he's got
> accolades. He's got Navy achievement medals for the very conduct
> that Mr. Parlatore is saying is dangerous and wanton. And we will
> demonstrate that in the record.

18

Yet, a review of the two Navy Achievement Medals that LT Shaw received demonstrates this to be yet another false statement.  One was for cataloging Heads-up Display ("HUD") videos from the T-45s in Pensacola and the other is a standard End-of Tour award from VFA-131, which makes no such reference.  While it would generally be possible that a lawyer would unknowingly made this false statement based on false information from his client, in this case, Mr. Montalvo did assist Plaintiff in his FNAEB and would have presumably reviewed his award citations before and perhaps even included them in his FNAEB package.

Thus, substantially all of the factual representations that Mr. Montalvo made to the Court on February 13, 2020 were false.  Although he told the Court no less than five times that he would "supplement the record" on these points, no such supplement was ever submitted because any such supplement would have revealed his statements to be completely false.

R.P.C. 3.3(a)(1) requires attorneys "to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  Yet, despite numerous requests from Defendant Parlatore, Mr. Montalvo has steadfastly refused to comply with his ethical obligations.

**Conclusion**

Someday, the case of LT Shaw will likely become a case study for military officer leadership courses of what to do when faced with a chronic IG complainer who also presents an unmitigated safety risk.   While LT Shaw has certainly secured his place in Naval Aviation history, this frivolous case continues.   It is time to end the abuse and sanction Plaintiff and his counsel for their frivolous conduct.

Respectfully submitted,

Timothy C. Parlatore, Esq.
*Defendant, pro se*
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
timothy.parlatore@parlatorelawgroup.com